# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 74135-7-I |
| | ) | |
| RAYMOND WESLEY GARLAND, | ) | DIVISION ONE |
| | ) | |
| Petitioner. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: April 18, 2016 |
| | ) | |

APPELWICK, J. — Garland was convicted of second degree murder, second

degree manslaughter, and second degree assault after shooting two men and

killing one of them. His conviction was affirmed on appeal. In a personal restraint

petition, Garland argues that he received ineffective assistance of both trial and

appellate counsel. He asserts, for the first time, that the trial court abused its

discretion by admitting evidence suggesting that he was affiliated with a gang, that

his verdict is inconsistent, that the trial court erred when it did not conduct the

appropriate inquiry before allowing his attorney to withdraw before sentencing, and

that he is entitled to a new trial based on cumulative error. We deny the petition.

## FACTS

On November 11, 2004, Raymond Garland met friends at a local bar called

Bleacher's. State v. Garland, 169 Wn. App. 869, 871, 282 P.3d 1137 (2012).

Shortly after midnight, Garland and a friend were talking in the Bleacher's parking lot when several cars pulled in. Id. at 871-72. One of the cars lightly struck a telephone pole while parking. Id. Garland made a comment to the driver about striking the pole, and an argument ensued. Id. at 872.

Earl "Keyon" Brock was the driver who struck the pole. Id. Brock was with his girlfriend, Shelley Dominick, his cousin, Karltin Marcy, Dominick's sister, Lisa Loggins, and another couple, Tim Valentine and Lisa Lambert. Id. Most of them had been drinking, at least moderately, at a party earlier that night. Id.

Dominick, Marcy, Loggins, Valentine, and Lambert all stated that Brock got into an argument with Garland. Id. Shortly thereafter, Brock was fatally shot in the chest and Marcy sustained a bullet wound to the groin. Id. The witnesses did not know Garland. See id. But, Valentine and Lambert recalled that the shooter had a neck tattoo and that the shooter had said his first name was Ray. Id. After contacting the police, both Valentine and Lambert later identified Garland from a photomontage. Id. Marcy also identified Garland as the shooter from a photomontage. Id. at 873.

Police arrested Garland on November 17, 2004. Id. The State charged Garland with first degree murder, first degree assault, first degree unlawful possession of a firearm, and second degree assault. Id. The State also alleged that Garland committed each of these crimes with a deadly weapon (a firearm). Id. After twice amending the information, the State eventually brought four charges to trial: premeditated murder or, in the alternative, murder as the result of extreme indifference to human life; second degree murder; first degree assault (for the

2

injury to Marcy); and first degree unlawful possession of a firearm. Id. The State alleged that Garland committed the first three charges while armed with a deadly weapon, a firearm. Id.

On January 24, 2007, Garland's trial began. Id. at 874. Garland waived his right to a jury trial on the unlawful possession of a firearm charge. Id. The trial court declared a mistrial on March 23 after the jury had been reduced to 11 members. Id.

Garland's second trial began on August 21, 2007, and again, Garland waived his right to a jury trial on the first degree unlawful possession of a firearm charge. Id. On September 24, Garland asked the assigned trial judge to recuse in light of newly discovered information about alleged threats to the trial judge from Garland's family and associates. Id. The trial court declared a second mistrial and immediately recused. Id.

Garland's third trial began on August 10, 2009. Id. Garland again waived his right to a jury on the unlawful possession of a firearm charge. Id. On October 26, the jury found Garland guilty of second degree manslaughter, second degree murder, and second degree assault. Id. The jury also found that Garland committed all three crimes while armed with a firearm. Id. On May 3, 2010, the trial court found Garland guilty of first degree unlawful possession of a firearm. Id.

Garland appealed. See id. at 871. In that appeal, Garland argued that the trial court abused its discretion when it allowed the State to impeach him with his trial counsel's opening statements from the two previous mistrials. Id. at 874-75. He also argued that the trial court violated the appearance of fairness doctrine. Id.

3

at 871. On August 8, 2012, Division Two affirmed Garland's convictions. Id. at 871, 894.

Garland filed this personal restraint petition (PRP) on July 17, 2013. He filed a supplemental opening brief with additional arguments on November 6, 2014.[1]

DISCUSSION

A petitioner may request relief through a PRP when he or she is under unlawful restraint.[2] In re Pers. Restraint of Monschke, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). The Washington Supreme Court has limited collateral relief available through a PRP, because it undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders. Id. The availability of collateral relief is limited in two ways. In re Pers. Restraint of Yates, 177 Wn.2d 1, 16, 296 P.3d 872 (2013). First, the petitioner in a PRP is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. Id. at 17. Second, new issues must meet a heightened showing before a court will grant relief. Id. For alleged constitutional errors, a petitioner has the burden of showing actual prejudice. Id. For alleged nonconstitutional errors, the

---

[1] The panel granted Garland an opportunity to submit supplemental briefing to preserve an argument that appellate costs should not be awarded to the State. The panel defers to the commissioner for a determination on the question of appellate costs should the State request them. We confer upon the commissioner the authority to deny the State's request on the basis of indigency in accordance with the factors outlined in State v. Sinclair, 72102-0, 216 WL 393719, at *6-*7 (Wash. Ct. App. Jan. 27, 2016)

[2] Garland is under "restraint" as he is confined under a judgment and sentence resulting from a decision in a criminal proceeding. RAP 16.4(b).

petitioner must show a fundamental defect resulting in a complete miscarriage of justice. Id. The petitioner must make these heightened showings by a preponderance of the evidence. Id.

When reviewing a PRP, this court has three options: (1) dismiss the petition,[3] (2) remand the petition for a full hearing on the merits or for a reference hearing pursuant to RAP 16.11(a) and RAP 16.12, or (3) grant the petition without remanding the cause for further hearing. Monschke, 160 Wn. App. at 488; Yates, 177 Wn.2d at 17. Dismissal is necessary where a petitioner fails to make a prima facie showing of actual prejudice, for alleged constitutional errors; or, for alleged nonconstitutional errors, a fundamental defect resulting in a complete miscarriage of justice. Yates, 177 Wn.2d at 17-18. A hearing is appropriate where the petitioner makes the required prima facie showing, but the merits of the contentions cannot be determined solely on the record. Id. at 18.

To establish a prima facie showing required for a reference hearing, a petitioner must offer the facts underlying the claim of unlawful restraint and the evidence available to support the factual allegations. Id. at 18. Mere bald assertions and conclusory allegations are insufficient to justify a reference hearing. Id. For matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief. Id. The evidence must be more than mere speculation or conjecture. Id.

---

[3] RAP 16.11 (b) states that the chief judge can dismiss a PRP or a panel of judges may deny a PRP.

Garland raises multiple issues through his PRP. He argues that his trial counsel was ineffective for failing to convey a plea offer, by acting unethically, and by failing to research the law during his third trial. Garland asserts that his appellate counsel was ineffective for failing to raise claims regarding the defects of a trespass order and search warrant used to search his mother's house. Garland contends that the trial court abused its discretion by admitting evidence suggesting that he belonged to a gang. He also asserts that his verdicts were inconsistent, that the trial court failed to make the proper inquiry before allowing his attorney to withdraw, and that he is entitled to a new trial based on the cumulative error doctrine.

I. Ineffective Assistance of Counsel

Garland argues that his trial counsel was ineffective. Effective assistance of counsel is guaranteed by both the federal and state constitutions. In re Pers. Restraint of Woods, 154 Wn.2d 400, 420, 114 P.3d 607 (2005). A successful ineffective assistance of counsel claim requires the defendant to show that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 674 (1984). The representation was deficient if it fell below an objective standard of reasonableness based on consideration of all the circumstances. In re Pers. Restraint of Davis, 152 Wn.2d 647, 672, 101 P.3d 1 (2004). Where an ineffective assistance of counsel claim is raised in a PRP, if the petitioner meets his burden under Strickland, the petitioner has necessarily met his burden to show actual and substantial prejudice as is required to satisfy the

6

standard for a PRP. In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

The court approaches an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective. Davis, 152 Wn.2d at 673. A petitioner can rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. Id. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. Id. We review claims of ineffective assistance of counsel de novo. Monschke, 160 Wn. App. at 490.

A. Ineffective Assistance of Trial Counsel – Plea Offer

Garland argues that he received ineffective assistance of trial counsel, because his trial attorney unreasonably failed to convey a plea offer that would have resulted in dismissal of a firearm enhancement and a sentence 10 years less than the sentence imposed after trial.

The right to effective assistance of counsel extends to the plea bargaining stage of a criminal prosecution. Lafler v. Cooper, __U.S.__, 132 S. Ct. 1376, 1384, 182 L. Ed. 398 (2012). Defense counsel is under an ethical duty to discuss plea negotiations with his or her clients. State v. James, 48 Wn. App. 353, 362, 739 P.2d 1161 (1987). If the attorney did not discuss the plea negotiations, a breach of this duty occurred, indicating deficient performance. Id.

If a defendant's right to effective assistance of counsel in considering whether to accept a plea bargain is denied, prejudice can be shown if loss of the

plea opportunity led to a trial resulting in conviction on more serious charges or on the imposition of a more severe sentence. Lafler, 132 S. Ct. at 1387. As to the uncertainty of whether plea bargain negotiations would have resulted in a consummated bargain, the standard is whether there is a reasonable probability that but for an attorney's error, a defendant would have accepted a plea agreement. James, 48 Wn. App. at 363-64.

Thus, whether Garland's trial attorney was ineffective turns on whether his attorney failed to communicate a plea offer, whether there is a reasonable probability that Garland would have accepted the plea offer, and whether Garland can show that his trial resulted in a conviction on a more serious charge or the imposition of a more serious sentence.

The plea offer in question is from November 2008. It was made in between Garland's second mistrial and the beginning of his third trial. Plea negotiations took place in an e-mail conversation between defense counsel, Barbara Corey, and Pierce County Deputy Prosecutor, Stephen Penner.

On November 13, 2008 at 8:21 a.m., Corey e-mailed Penner and informed him that she would welcome the opportunity to discuss a possible resolution of the case. Corey questioned the veracity of the State's evidence and proposed a guilty plea to second degree manslaughter and dismissal of another assault case against Garland. Corey also stated that Garland's mother would agree not to pursue an unrelated civil claim against the Pierce County Sherriff's Department.

Penner responded on November 21, 2008 at 2:43 p.m. He stated that the best deal he could offer Garland was to amend the charge for Brock's death to

8

murder in the second degree (felony murder) with a firearm enhancement and amend the charge for Marcy to assault in the second degree with no firearm enhancement. He noted that if Garland took the deal, Garland's total time served for both this case and another assault case would be 225 months.[4] Penner asked Corey to communicate the offer to Garland. Corey responded that same day at 3:13 p.m.—half an hour later. She said that it was not a "terribly bad offer," but she countered with manslaughter in the first degree and "[a]greement the same on the other assault case." She said that she could "sell" her counter-proposal. Penner responded on November 25, 2008 at 4:23 p.m. informing Corey that he could not reduce the charge to manslaughter and that murder in the second degree was his last and best offer. Penner told Corey that if Garland wished to accept that deal that she should set the plea date, but if not, that they should go to trial. Ten minutes later Corey responded only, "Happy Turkey Day to you and your family. B." Nothing in the record indicates that Corey explicitly rejected the State's counter offer on November 25, 2008 or on a later date.

Garland argues that the timing on the e-mail communications is evidence that Corey did not communicate the plea offer. Garland argues that nothing about

---

[4] Had Garland accepted the State's November 2008 plea offer and had the court sentenced Garland based on the charges in the guilty plea, Garland would have received a 225 month sentence. After going to trial, Garland was convicted of murder in the second degree, assault in the second degree, and unlawful possession of a firearm in the first degree. He was sentenced to 346 months. The State does not refute that Garland's trial resulted in a conviction on a more serious charge or the imposition of a more serious sentence than the terms of the plea offer.

the e-mail correspondence shows that defense counsel had communicated or intended to communicate with Garland about pleading guilty.

In response, the State submitted a declaration from Corey. Corey stated that it was Garland's position during the entire time she represented him that he would never plead guilty to any <u>murder</u> charge. She maintained that Garland's goal was an acquittal or, at most, a manslaughter conviction. She noted that the only offer that the prosecutor made in this case (after the second mistrial) was an offer that Garland adamantly rejected.

But, Corey also references a plea offer from <u>November 2009</u> in her declaration—not the November 2008 offer. That plea offer was in reference to an unrelated assault case under a different cause number. Thus, it is unclear from Corey's declaration which case she was referring to when she noted that Garland adamantly rejected the "only offer."

Garland then submitted a declaration clarifying that Corey never told him about the plea offer made by the prosecutor "<u>before</u> [his] third trial"—presumably referencing the November 2008 plea offer. He stated that had Corey told him about the plea offer, he would have taken it. Garland noted that it was possible that he told Corey he would never plead guilty to murder. But, that if he did say that, it was early on, before he went through two mistrials.

As Garland correctly points out in his reply brief, Corey does not specifically address in her declaration whether she communicated the November 2008 pretrial plea offer to Garland. To address the lack of specificity in Corey's declaration and

10

the parties' differing interpretations of the November 2008 e-mails, Garland argues that the case must be transferred to the superior court for a reference hearing.

In order to support a request for a reference hearing, a petitioner must state in his petition the facts underlying the claim of unlawful restraint and the evidence available to support the factual allegations. In re Pers. Restraint of Rice, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). This does not mean that every set of allegations which is not meritless on its face entitles a petitioner to a reference hearing. Id. at 886. Rather, the petitioner must state with particularity facts which, if proven, would entitled him to relief. Id. The purpose of a reference hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support his allegations. Id. Thus, a mere statement of evidence that the petitioner believes will prove his factual allegations is not sufficient. Id.

Garland argues that he has provided sufficient evidence supporting his position that Corey never communicated the 2008 pretrial plea offer. He cites to jail visit and phone logs showing a lack of contact between Corey and Garland after the November 2008 plea offer was made, declarations of Garland's family members stating that they did not learn of any plea offers until after trial, and billing records to support his assertion that the offer was never communicated.

The pretrial plea offer was communicated to Corey on November 21, 2008. Garland's third trial commenced on August 10, 2009. Garland, 169 Wn. App. at 874. Garland does not cite to anything in the record indicating that Corey explicitly rejected the State's plea offer prior to communicating the offer to Garland and prior to the commencement of trial. Rather, he assumes that because Corey did not

11

accept the offer on November 25, 2008, that she rejected it. But, this is an improper and unsupported assumption. The offer, by its terms, was left open on November 25 and could have been accepted by noting a plea date before trial. Any evidence that there was communication between Corey and Garland between November 25, 2008 and August 19, 2009 is relevant to whether Corey communicated the settlement offer to Garland.[5]

Corey's billing records indicate that she spoke with Garland on the phone at least once after the State made the plea offer—on December 12, 2008.[6] Her billing entry does not indicate the nature of the phone call. The fact of the call leaves open the possibility that Corey communicated the plea offer to Garland on that date and that he rejected it on that date.

Garland next points to his investigator's billing records to prove that the offer was never actually communicated. He first notes that Corey's declaration indicated that she met with Garland only when the investigator was present. He then claims that the investigator's detailed billing records show that no plea agreement was ever communicated to Garland during their meetings. The

---

[5] Even if Corey erroneously rejected the State's first counter-proposal in the November 2008 e-mail exchange, that error was harmless, because the State made the same offer again after Corey countered with manslaughter in the first degree. And, at oral argument, Garland conceded that the only plea offer he is claiming was not properly communicated was the last offer communicated by the State during the November 2008 e-mail negotiations.

[6] And, Corey spoke with Garland's mother three times before trial began— December 17, 2008, January 19, 2009, and February 25, 2009. Corey kept in close communication with Garland's mother throughout Garland's legal proceedings. In fact, the November 2008 plea discussions imply that Corey had authority from Garland's mother to initiate the negotiations. This is evident from Corey's offer, which included the promise that Garland's mother would withdraw her civil lawsuit against the Pierce County Sherriff's Department.

investigator's single billing entry referencing a meeting with Garland after the plea offer and before trial does not state that a plea was discussed.[7] But then, mere absence of a reference does not give rise to an inference that a plea offer was not discussed. The investigator had no duty to detail the substance of their discussion and the investigator's other billing entries did not specify what was discussed during every meeting with Garland. In fact, most of the investigator's entries simply say some variation of "met with client." Therefore, the investigator's billing records do not prove that Corey never discussed plea offers with Garland.

Corey declared that she communicated "every plea offer" to Garland. The billing records of Corey and the investigator establish that Corey and Garland had contact during which Corey could have communicated the plea offer. Garland has provided only bald assertions, conclusory allegations, and speculative evidence that Corey never communicated the November 2008 plea offer to him. We approach an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective. Davis, 152 Wn.2d at 673. Therefore, Garland has failed to show both that he is entitled to a reference hearing to prove that Corey never communicated the offer and that Corey's performance was deficient. See Rice, 118 Wn.2d at 886 (we seek to avoid the time and expense of a reference hearing when the petition has no apparent basis in provable fact). Therefore, we need not discuss whether Garland was actually prejudiced. See In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012) (stating

---

[7] On August 9, 2009, the investigator went to the jail and "discussed strategy with Ray."

13

that a court need not consider both prongs of <u>Strickland</u> if a petitioner fails on one). We hold that Garland has failed to show that trial counsel was ineffective by not communicating a plea offer.

### B. Ineffective Assistance of Trial Counsel – Ethical Violations

Next, Garland argues that his trial attorney was ineffective, because she violated her duty of candor toward the tribunal and violated her discovery obligations. He argues that her behavior constituted a per se unreasonable trial strategy.

Garland's argument relates to Corey's representation to both the trial court and the State about what Garland's defense would be during his third trial. On March 25, 2005, before his first trial, Garland indicated in an omnibus order that the general nature of his defense would be self-defense. On January 13, 2006, Garland indicated in another omnibus order that his defense was both general denial and self-defense. Before the third trial commenced, Garland filed a notice of defense. It stated that, consistent with the previous omnibus orders, Garland's defense would be general denial and/or self-defense.

Garland's first trial began on January 24, 2007. <u>Garland</u>, 169 Wn. App. at 874. Garland's second trial began on August 21, 2007. <u>Id.</u> His third trial began on August 10, 2009. <u>Id.</u>

During the first two trials, Corey gave her opening statement immediately following the State's opening statement. In opening statements during both the first and second trial, Corey told the jury that both Garland and Brock had guns on the night of the incident. <u>See Garland</u>, 169 Wn. App. at 876-77.

14

During the third trial in August 2009, the defense reserved its opening statement. Id. at 877. In preliminary discussion outside of the jury's presence, the trial court asked whether, in light of Garland's failure to submit proposed jury instructions before trial, " 'are there going to be any theories that have not been advanced such that the State has to be considering them?' " Id. Garland responded that he continued to endorse " 'general denial and/or a self-defense.' " Id. When further pressed as to whether any new theories would be advanced that the State should be aware of prior to delivering its opening statement, Garland again said, " 'No.' " Id.

Garland reserved his opening statement until after the State had rested its case. After the State rested, Corey began her opening statement by stating that there was only one gun involved in the incident and that it was not Garland's:

> "Good morning, ladies and gentlemen. November 11th, 2004, was, in fact, [Garland's] birthday. [Garland] was 21 that day. It was to be a day of celebration. The day of celebration turned into a horror, a nightmare. [Garland] was terrorized by Mr. Brock and Mr. Marcy, who pulled a gun on him in the parking lot of Bleacher's. There was a struggle for the gun. The gun went off. [Garland] was grabbing the hand of Mr. Brock and Mr. Marcy, trying to keep himself from being shot."

Garland, 169 Wn. App. at 877-78 (alterations in original). She also represented that because Garland was terrified, he decided to struggle for the gun. Id. at 878. She said that Garland lunged at Brock and they had a physical fight over the gun. Id. Corey represented that it was during the physical struggle that Garland heard a shot go off. Id.

Garland testified during the third trial. Id. at 879. Garland testified consistently with the version of the facts Corey presented during her opening argument in the third trial—the "struggle for the gun," accident version. Id. Specifically, on cross-examination, Garland testified that there was a struggle over one gun and that Garland did not have his own gun that night. Id. Immediately after Garland's testimony, outside of the presence of the jury, the State asked that it be allowed to impeach Garland with the prior inconsistent statement of his attorney in the two prior mistrials. Id. at 880. Following argument, the trial court ruled that the State could impeach Garland with Corey's earlier inconsistent opening statements to a degree. Id. at 882.

The State then continued its cross-examination of Garland:

"Q. All right. So I will ask it again. You were in court on January 24th of 2007, and again on August 21st, 2007 when [defense counsel] made certain statements about the case, correct?

"A. Yes.

"Q. All right. And both of those times [defense counsel] stated that you had your own gun that night, correct?

"A. Yes.

"Q. And both times [defense counsel] stated that Mr. Brock produced a revolver and pointed it at you, isn't that correct?

"A. Yes.

"Q. And both times [defense counsel] stated that you then took out your own gun and shot Mr. Brock; isn't that correct?

"A. Yes, that's correct, she stated that."

Id. at 884-85.

16

After Garland was convicted in the third trial, he appealed. Id. at 871. He argued that the trial court erred in allowing the State to impeach him with his counsel's opening statements from two prior proceedings that ended in mistrials. Id. In Garland, the Court of Appeals concluded that the trial court did not abuse its discretion in allowing limited impeachment of Garland through use of his counsel's opening statements of fact in the first two trials. Id. at 894.

Now, in his PRP, Garland argues that his trial counsel was ineffective, because she violated various ethical rules when she misrepresented the general nature of Garland's defense in response to a direct inquiry from the trial court.

Under the Strickland standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel. Nix v. Whiteside, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 123 (1986). A lawyer's ethical violations do not make the lawyer per se ineffective. Burt v. Titlow, ___ U.S. ___, 134 S. Ct. 10, 18, 187 L. Ed. 348 (2013).

Garland claims that Corey's actions—failing to disclose the accident defense when explicitly asked by the court—constituted a violation of several ethical standards and court rules.[8] Garland argues that a reasonable trial strategy

---

[8] RPC 3.3 (requiring candor to the tribunal), RPC 8.4(c) (stating that an attorney may not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), RPC 8.4(d) (stating that an attorney may not engage in conduct prejudicial to the administration of justice), RPC 3.4(c) (stating that a lawyer may not knowingly disobey an obligation under the rules of a tribunal), RPC 3.4(d) (stating that a lawyer may not fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party), RPC 3.4(e) (stating that an attorney may not allude to any matter that will not be supported by admissible evidence), CrR 4.7(b)(2)(xiv) (court rule governing discovery in trial stating that an accused person may be required to state the general nature of the defense).

cannot be premised upon a violation of a discovery obligation and multiple ethical rules. As a result, Garland argues that counsel's performance was deficient.

The State concedes that if the facts are as Garland represents them, then Garland's petition properly criticizes Corey's lack of candor to the court. But, it contends that even if Corey purposely deceived the State and violated the duty of candor to the court, her performance is not necessarily constitutionally deficient. The State argues that Garland fails to demonstrate how Corey's unethical conduct affected the jury's verdict. The State notes that the jury was not aware of Corey's representations to the court about Garland's defense.

Garland responds that he was prejudiced by Corey's lack of candor, because if Corey had been candid in disclosing the nature of Garland's defense, the trial court would likely have rejected the State's request to impeach him with counsel's earlier opening statements. He contends this is so, because the trial court's remarks during its ruling show concern about issues of fairness and the prejudice to the State caused by Corey's dishonesty. He argues that the impeachment evidence was prejudicial, and that it is irrelevant that the jury remained ignorant of Corey's misrepresentations to the court.

But, the trial court ultimately allowed the State to impeach Garland based on the relevant impeachment law and argument of the parties, not as a sanction for defense counsel's behavior. When the State first requested to impeach Garland with the prior opening statements, the trial court ruled that it would recess for a week to allow both parties to fully brief the issue. Garland, 169 Wn. App. at 880. The trial court then heard argument on the issue. During Garland's argument,

18

he worked to distinguish the impeachment case law cited by the State. The trial court concluded that because the case law stood for the fact that it is acceptable to impeach with a lawyer's inconsistent statement made during pretrial discovery, that it would certainly allow for impeachment based on a lawyer's opening statement made at a mistrial. Thus, the trial court's ultimate ruling considered relevant case law.

And, the trial court's focus on fairness was not related only to defense counsel's tactic to withhold its change in strategy. Instead, the trial court's fairness concerns focused on the discrepancy between the statements made during the different trials. The court opined:

> And you know, I believe there's a bigger argument than that at stake here, and that's just the fairness and integrity of this whole system. What if people from the public look in on this case, that know nothing about the history, or anything else, and what will the jurors think in the two cases when they find out, okay, in one case, they say one thing, and then they turn around in the next case and say something entirely different and nobody points it out? That's not fair. That's no way to resolve a legal dispute. That's no way to advance the truth seeking function. These things have to be brought to the jury. You just can't get away with saying one thing and then turning around and saying the almost exact opposite at a later time.

Thus, the trial court's ruling allowing the State to impeach Garland with counsel's prior opening statement was not based upon only the trial court's concern about the prejudice to the State caused by Corey's misrepresentation of the defense. Presumably the trial court would have reached the same ruling based on the case law and fairness even if Corey had disclosed the "accident theory" earlier. Garland is unable to show that he was prejudiced by Corey's alleged

19

ethical violations. We hold that Corey's alleged ethical violations did not render her assistance ineffective.

### C. Ineffective Assistance of Trial Counsel – Changing Defenses

Next, Garland argues that his trial counsel was ineffective for changing defenses—maintaining that Garland did not have his own gun on the night of the incident—without first researching the law. Garland argues that had Corey adequately researched the law, she would have known that Garland could be impeached with her prior inconsistent opening statements.[9] Implicit in Garland's argument is that Corey was ineffective for failing to inform him of a risk of the new trial strategy.

Reasonable conduct for an attorney includes carrying out the duty to research the relevant law. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Failing to research or apply relevant law will constitute deficient performance if it falls below an objective standard of reasonableness based on consideration of all the circumstances. Id. at 868-69.

---

[9] This issue is directly linked to Garland's argument in his direct appeal that the trial court erred when it allowed the State to impeach him with his counsel's statements from two prior proceedings. Garland, 169 Wn. App. at 871. A petitioner generally may not renew a previously determined issue simply by recasting it as an ineffective assistance of counsel claim. In re Pers. Restraint of Stenson, 142 Wn. 2d 710, 720, 16 P.3d 1 (2001). But, the Garland court specifically invited Garland to bring an ineffective assistance claim against his attorney in a PRP on this basis. Garland, 169 Wn. App. at 893 n.11 ("Garland has not raised an ineffective assistance of counsel claim in this appeal. Thus, we do not address whether a communication breakdown or other tactical decisions leading to Garland's impeachment in trial or whether any of counsel's conduct constituted ineffective assistance. We note that Garland may bring such a claim in a [PRP] under RAP 16.4.").

Garland begins by arguing that, "[i]t is well-established that an accused person may be impeached with prior statements made by defense counsel." By beginning with that assertion, Garland makes an underlying, speculative assumption necessary to support his claim that defense counsel's performance was deficient. Garland assumes that his defense counsel did not research the "well-established" law. This court approaches an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective. Davis, 152 Wn.2d at 673.

Garland argues that it is clear that Corey did not research the law, because she was caught off guard and expressed surprise when the court ruled that the State could impeach Garland using the prior opening statements. But, an expression of surprise is not inconsistent with the demeanor of any attorney who loses a motion, no matter how well-researched or how uninformed. Garland provides only speculative evidence and fails to rebut the strong presumption that counsel's representation was effective.

But, even if Garland presented evidence indicating that Corey failed to research the issue, Garland would still need to show that Corey's research would have produced Washington law dictating that her strategy to change defenses was ill-advised.

In the direct appeal, the Garland court stated that whether the State may use trial counsel's opening statement from prior proceedings to impeach a defendant was an issue of first impression in Washington. 169 Wn. App. at 874-75. It specifically noted that in Washington little precedential authority was

21

available to assist it in making its decision. Id. at 875. In order to make its decision, the Garland court turned to authority from another jurisdiction—one case from the Second Circuit, United States v. McKeon, 738 F.2d 26 (2d Cir. 1984). Id. at 889. The Garland court noted that neither party briefed the McKeon decision. 169 Wn. App. at 889. The Garland court applied the McKeon test to determine the admissibility of the opening statements. Id. at 892-93. It concluded on the facts in Garland's case, the trial court did not abuse its discretion in allowing limited impeachment of Garland. Id. 894. Notably, the Garland court did not conclude that opening statements from other trials are per se admissible to impeach a defendant. Rather, it concluded only that the trial court, in this instance, did not abuse its discretion. Id.

Additionally, Garland cites to Kyllo for his assertion that a failure to research relevant law falls below an objective standard of reasonableness. In Kyllo, the court held that where existing Washington case law indicates that a pattern jury instruction is flawed, counsel's failure to research or apply relevant law may constitute deficient performance. 166 Wn.2d at 868-69. The Kyllo court specifically reasoned that there were "several" relevant Washington cases available at the time of trial that counsel should have discovered. 166 Wn.2d at 866-869. The Kyllo court distinguished Kyllo's case from State v. Studd, 137 Wn.2d 533, 973 P.2d 1049 (1999). Id. at 866. In Studd, the court concluded that where there is no case law indicating that a pattern jury instruction misstates the law, it is not deficient performance for defense counsel to propose such an instruction. See 137 Wn.2d at 551. The Studd court noted that in those

circumstances, counsel can hardly be faulted for requesting a jury instruction based upon a then-unquestioned pattern jury instruction. Id.

Washington case law available at the time of Garland's third trial indicated that a defendant could be impeached with his opening statement from the same trial (State v. Rivers, 129 Wn.2d 697, 708-09, 921 P.2d 495 (1996)) and by the admission of statements made by counsel previously at an omnibus hearing (State v. Dault, 19 Wn. App. 709, 717-18, 578 P.2d 43 (1978); State v. Acosta, 34 Wn. App. 387, 391-92, 661 P.2d 602 (1983), reversed on other grounds by, 101 Wn.2d 612, 683 P.2d 1069 (1984)). Garland argues that there is little reason to suppose Rivers would have been decided differently if counsel's statement had been made during a prior trial rather than earlier in the same trial. But, no case law had discussed using a statement of counsel in one trial for impeachment of the client in a different trial. Thus, additional research would not have informed Corey that switching to the accident theory for the third trial was flawed.[10]

We conclude that defense counsel's performance was not deficient when Garland, determining an issue of first impression in Washington, had not yet been decided. An attorney's failure to anticipate a change in the law does not constitute ineffective assistance of counsel. See In re Pers. Restraint of Benn, 134 Wn.2d

---

[10] This does not mean that Corey was oblivious that there were risks involved with changing theories for the third trial. Corey's declaration states that she discussed the dangers of shifting defenses with Garland prior to the third trial. Corey stated that Garland understood the risks perfectly, but that he wanted to take the risk. By contrast, in his declaration, Garland asserts that Corey never told him that he could be impeached with her opening statements from the first two trials.

868, 939, 952 P.2d 116 (1998) (an ineffective assistance claim fails on the merits because counsel cannot be faulted for failing to anticipate a change in the law).

## II. Ineffective Assistance of Appellate Counsel

Garland argues that his appellate counsel provided ineffective assistance by failing to raise meritorious claims regarding warrants used to search Garland's mother's house. He claims the warrants were unsupported by probable cause and supported by affidavits containing material omissions made with reckless disregard for the truth. He contends that appellate counsel should have challenged the trial court's denial of a motion to suppress evidence obtained through execution of the search warrants.

Pierce County Sheriff Detective Deborah Heishman was the lead detective investigating the shooting. A month or two prior to the shooting, Detective Heishman had investigated another case in which Garland was the suspect. During the earlier investigation, she unsuccessfully attempted to find Garland. But, during the course of that investigation, she contacted and had a confrontation with Margaret Cook, Garland's mother, at her house in Tacoma. At that time, Detective Heishman went looking for Garland at Cook's house, because it was listed as Garland's address in the Department of Licensing (DOL) records. Cook provided Detective Heishman oral consent to enter her residence and look for Garland. Cook told Detective Heishman that Garland did not live with her at the Tacoma address and that Garland had phone and utility bills in his name at another

address.[11] Cook eventually revoked her consent to allow Detective Heishman to search the residence.

This caused a confrontation between the two women. Cook filed a complaint about Detective Heishman with the Pierce County Sherriff Department's Internal Affairs department. Cook alleged that when she revoked consent for Detective Heishman to enter her home, Detective Heishman grabbed Cook's arm. Cook's complaint was pending with Internal Affairs throughout Detective Heishman's investigation into the shooting.

While Detective Heishman was investigating the other incident for which Garland was a suspect, Cook was in the process of moving from Tacoma to Graham, Washington. After the shooting at issue here, Detective Heishman did not know where Garland lived. Therefore, she prepared a complaint for an order of trespass to determine if Garland was living with Cook at her new Graham address.

Detective Heishman's affidavit in the complaint for trespass order indicated that Detective Heishman had previously located Garland's vehicle outside of the Tacoma address, that Cook had been uncooperative in locating Garland at that time, that Cook had told a co-worker that she was hiding Garland to prevent him from being arrested, and that Cook had recently appealed the impound of Garland's car and listed the Graham residence as her current address.

---

[11] Detective Heishman relied on the DOL information to locate Garland's address, because she had no access to utility and phone records.

On November 15, 2004, a judge approved the trespass order. That night, Deputy Daniel Hacker and Detective Kevin Reding began surveillance of the Graham residence. The detectives climbed over a fence at the Graham house and hid in bushes in the backyard. The detectives observed Garland in the house. Based on this information, on November 16, 2004, Detective Heishman obtained a warrant to search the Graham house for evidence of the shooting. Detective Heishman's affidavit indicated that Deputy Hacker paged her from the surveillance scene indicating that he was watching Garland in the Graham residence.

Officers seized photographs found hidden in the ceiling of a bedroom during the search of the Graham house. The photos were of Garland and another man posing with what appeared to be several rifles or assault weapons. On January 17, 2007, Garland moved for a Franks[12] hearing, arguing that the search warrants were fatally flawed by deliberate falsehoods and/or statements made with reckless disregard for the truth.[13] Garland challenged both the trespass order and the search warrant.

Garland argued that Detective Heishman knew and omitted important information in her complaint for the search warrant. Specifically, among other things, he argued Detective Heishman (1) failed to inform the issuing magistrate

---

[12] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 667 (1978).

[13] A defendant challenging a warrant on this basis is entitled to an evidentiary hearing, known as a Franks hearing, if he or she makes a substantial preliminary showing of the omissions and their materiality. State v. Garrison, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992). If an evidentiary hearing is held, the defendant must then show that any omissions were (1) intentionally or recklessly made and (2) were material, that is, they were necessary to the finding of probable cause. See State v. Gentry, 125 Wn.2d 570, 604, 888 P.2d 1105 (1995).

that she knew Garland's vehicle was registered to the Tacoma address, (2) failed to inform the issuing magistrate that Cook had informed her that Garland has a phone and a utility bill in his name at another residence, and that (3) Internal Affairs was investigating Cook's complaint against Detective Heishman. He argued that because there were insufficient facts to connect Garland to Cook's property, there was no probable cause upon which to search for him on her property. Garland requested that all evidence found during the search of his room be suppressed.

The trial court held a Franks hearing. At the hearing, Cook's co-worker, Michael Frye, testified that he never told Detective Heishman that Cook was hiding Garland. And, the trial court found that Detective Heishman should have included information about the Internal Affairs Investigation in her affidavits. But, it concluded that although that information would have given the magistrate some perspective, that potential bias is not something that negates probable cause. The trial court noted that the more critical issue was the direct contradiction between Detective Heishman's statement that Frye told her that Cook was hiding Garland and the fact that Frye denied ever saying that. The trial court found that Detective Heishman's testimony was more credible than Frye's.

The trial court ultimately found that any of Detective Heishman's omissions were negligent—not intentionally done and/or were not with reckless disregard. It thus found that there was sufficient probable cause for the magistrate to issue the warrants. The trial court declined to suppress the evidence. The trial court made its oral ruling, but did not enter any findings of fact or conclusions of law.

Notwithstanding the trial court's oral ruling, the State indicated that it did not plan to offer any evidence found during the search of the Graham house at trial.

On August 26, 2009, during the third trial, Garland's attorney cross-examined Patrick LaChapelle, the other man in the posed gun photos. LaChapelle and Garland were friends since middle school. LaChapelle picked Garland up on the night of the incident. During cross-examination, LaChapelle testified as follows:

Q.   Okay. Do you recall whether or not Ray had a firearm on him that night?

A.   I'm pretty positive he didn't, did not.

Q.   Have you ever seen him with a firearm?

A.   Have not.

Because of this testimony, the State informed the court that it wished to admit the pictures found in the ceiling at the Graham house. In response, Garland indicated that he wanted a new Franks hearing.

Outside of the presence of the jury, the State sought confirmation that LaChapelle never saw Garland with any guns. The State then showed LaChapelle the photos, and asked if he recalled a time when he was at Garland's house posing with what looked like rifles and machine guns.[14] LaChapelle admitted that it was him in the photos, but testified that he did not recall. Garland argued that it was prejudicial to put the photos before the jury when there was no foundation—there was no evidence that LaChapelle took the pictures or that he was present when

---

[14] The photos were on the same negatives, but none of the photos were of both Garland and LaChapelle together holding the guns.

28

the pictures were taken. The trial court noted that it was defense counsel who asked LaChapelle about the firearms and opened the door to the evidence. The trial court said that the State could admit the photos, but it first needed to lay additional foundation indicating the circumstances surrounding where the photos came from. But, the court ultimately deferred its ruling on whether the photos could be admitted into evidence.

On September 9, 2009, outside of the presence of the jury, the State informed the court that it planned to call a detective to authenticate the photos at issue and to then admit some of the photos. The State argued that the court did not need to relitigate the legality of the search, because it had already conducted a Franks hearing declaring the search legal and because the legality of the search was irrelevant—defense counsel had opened the door for the photos through LaChapelle's testimony.

Garland argued that the court reviewed only the search warrant at the Franks hearing as opposed to both the trespass order and the search warrant. Garland noted that he would have moved for reconsideration after the Franks hearing, but the State said that it did not plan to use the evidence from the residence. He noted that the State's intention not to use the evidence was made clear by its failure to present written findings of fact after the trial court's ruling. Eventually, Garland summarized his renewed challenge to the search as a motion to reconsider.

The trial court ruled that it did not see any issues before it that were not already addressed in the Franks hearing and that it saw no basis to reconsider. It

continued that even in the event that the searches leading to the discovery of the photos were illegal, it would determine whether the photos were appropriate impeachment evidence. The trial court ruled that the photos were proper impeachment evidence.

The photos of Garland were admitted during trial. Garland did not raise the issue of the illegality of the search warrants or an error regarding the ruling on Garland's motion to suppress in his direct appeal. See Garland, 169 Wn. App. 871.

A criminal defendant has a right to effective assistance of counsel on his first appeal of right. In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate the merit of any legal issue appellate counsel raised inadequately or failed to raise and also show how he or she was prejudiced. In re Pers. Restraint of Netherton, 177 Wn.2d 798, 801, 306 P.3d 918 (2013). Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance, and the exercise of independent judgment in deciding what issues may lead to success is the heart of the appellate attorney's role. Dalluge, 152 Wn.2d at 787.

A. Sufficiency of Probable Cause in Search Warrants

The issuance of a search warrant is a highly discretionary act. State v. Chenoweth, 160 Wn.2d 454, 477, 158 P.3d 595 (2007). It is founded in a commonsense reading of the warrant affidavit and the reasonable inferences that can be drawn therefrom. Id.; State v. Maddox, 152 Wn.2d 499, 505, 98 P.3d 1199

(2004). This court generally reviews the issuance of a search warrant only for abuse of discretion. State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). However, at the suppression hearing, the trial court acts in an appellate-like capacity and its review, like this court's, is limited to the four corners of the affidavit supporting probable cause. Id. Although this court defers to the magistrate's determination, the trial court's assessment of probable cause is a legal conclusion this court reviews de novo. Id.

To establish probable cause, the affidavit must set forth sufficient facts to convince a reasonable person of the probability the defendant is engaged in criminal activity and that evidence of criminal activity can be found at the place to be searched. State v. Lyons, 174 Wn.2d 354, 359, 275 P.3d 314 (2012). Probable cause may be based on hearsay, a confidential informant's tip, and other unscrutinized evidence that would be inadmissible at trial. Chenoweth, 160 Wn.2d at 475. Probable cause requires more than suspicion or conjecture, but it does not require certainty. Id. at 476.

Garland argues that the trespass order was unsupported by probable cause and that appellate counsel was ineffective for failing to raise that issue on appeal.[15] The complaint for trespass order requested to enter upon the Graham property for the purpose of locating Garland, to photograph occupants and guests coming and

---

[15] Garland contends that because the officers conducted a search of the Graham house under the state and federal constitutions that the trespass order is subject to the same scrutiny as any other search warrant. The State does not challenge Garland's characterization of the trespass order as a search warrant nor does it contend that this court's review of trespass orders is different than its review of search warrants.

going from the property, and to confirm that Garland was residing at the residence. The judge concluded that there was probable cause to support the actions requested to be taken in the complaint for trespass.

Thus, the question before us is whether the facts available to the judge justified a reasonable belief that evidence of a crime could be obtained by searching the outside of the Graham house. Garland does not appear to argue that the affidavit had insufficient probable cause to connect Garland to the crime, but rather, he argues that there was no nexus between the allegations against Garland and Cook's Graham property.

But, there were facts in Detective Heishman's affidavit connecting Garland to Cook and facts connecting Cook to the Graham house. First, Frye told Detective Heishman that Cook had been telling people that she was hiding Garland to avoid having him arrested. The affidavit made it clear that Frye would be knowledgeable because he had a connection to the Garland family—legal documents found inside Garland's vehicle belonged to Frye. Additionally, it stated that Cook had filed an appeal of Garland's impounded vehicle. In Cook's appeal for the impounded car, she listed her new physical address as the Graham address.

Thus, Detective Heishman's affidavit described the fact that a person close to Garland's family said that Cook claimed she was hiding Garland. And, the affidavit provided recent information that Garland's mother was living at the Graham property. It was a reasonable inference that Cook—a person claiming to be actively hiding Garland—would be keeping him in a location under her control. These facts created more than suspicion or conjecture that Cook was hiding

Garland. Therefore, we conclude that there was sufficient probable cause for the judge to issue a trespass order that authorized the officers to search the outside of the property.

Next, Garland argues that his appellate counsel was ineffective for not challenging the constitutionality of the search of the inside of the Graham house. He notes that the affidavit in support of the warrant to search the interior of the Graham house had only one additional fact in support of it—that officers had seen Garland inside the house. He argues that because that information was illegally obtained, the information could not be used to support the subsequent search warrant. He argues that once that information is excised, the second affidavit suffers from the same infirmities as the affidavit for the trespass order.

But, because the trespass order was properly supported by probable cause, the information that Garland appeared to be residing in the Graham house was not illegally obtained and it need not be excised from the second search warrant.[16] Therefore, we conclude that the second search warrant—now with a fact making it certain that Garland was connected to the Graham house—was also supported by probable cause. We hold that appellate counsel was not deficient for failing to challenge the sufficiency of either search warrant on appeal.

B. Material Omissions in Search Warrants – *Franks* Hearing

Still, Garland argues that his appellate attorney should have challenged the validity of the search warrants, because Detective Heishman recklessly omitted

---

[16] Garland notes that he was not actually residing in the house, but was instead at the house attending a birthday celebration for his mother. It was not an unreasonable inference that Garland was residing in the house.

information material to whether Garland actually lived in Cook's house from her affidavit. Specifically, he argues that Detective Heishman withheld evidence that (1) Garland's car was registered at another address (2) Cook had previously told the police that Garland did not live with her, (3) Garland had phone and utility bills in his name at another residence, and (4) Internal Affairs was investigating Cook's complaint against Detective Heishman.

Once issued, a warrant is entitled to a presumption of validity, and the court will give great deference to the magistrate's determination of probable cause and resolve any doubts in favor of the warrant. Chenoweth, 160 Wn.2d at 477. A warrant may be invalidated, however, and the fruits of a search may be suppressed if there were intentional or reckless omissions of material information from the warrant affidavit. State v. Atchley, 142 Wn. App. 147, 157-58, 173 P.3d 323 (2007). Even if the defendant is able to prove an intentional or reckless omission at an evidentiary hearing, he would still be required to show that probable cause to issue the warrant would not have been found had the omissions been included in the affidavit. See State v. Gentry, 125 Wn.2d 570, 604, 888 P.2d 1105 (1995). The motion to suppress with the omissions added will fail if a reasonable magistrate could find that the information contained in the revised affidavit or complaint for search warrant supports a finding of probable cause. Id. at 606. As discussed above, whether an affidavit supports a finding of probable cause is a legal issue this court reviews de novo. Neth, 165 Wn.2d at 182.

Garland first argues that his appellate attorney should have challenged the fact that no written findings of fact and conclusions of law were entered after the

oral ruling during the <u>Franks</u> hearing and after the trial court's ruling on his renewed suppression challenge during trial in 2009. He argues that the trial court's and the State's failure to enter findings was a violation of CrR 3.6 and that dismissal is the proper remedy. The State responds that findings of fact are unnecessary, because the trial court denied Garland's suppression motion as a matter of law. The State contends this is so, because at the <u>Franks</u> hearing, the trial court concluded that even if statements Detective Heishman omitted had been included, probable cause still existed to support the warrant. Therefore, even if appellate counsel had appealed this issue during the direct appeal, and even if the court concluded that all of the omissions were reckless—Garland's desired outcome—he would still need to show that the affidavit was not supported by probable cause even with the omitted statements. Findings of fact and conclusions of law are unnecessary to review this determination de novo.[17]

Even assuming all of these facts were recklessly omitted, the affidavit still supports a finding of probable cause. That Garland's car was registered at another address, that Cook had previously told the police that Garland did not live with her, and that Garland had phone and utility bills at another residence are not inconsistent with the fact that Cook was hiding Garland.

---

[17] Moreover, a court's failure to enter written findings of fact and conclusions of law following a suppression hearing as required by CrR 3.6 is harmless error if the court's oral opinion and the record of the hearing are so clear and comprehensive that written findings would be a mere formality. <u>State v. Smith</u>, 76 Wn. App. 9, 16, 882 P.2d 190 (1994). However, here, the trial court addressed each of Garland's challenges to the statements in the affidavits point by point on the record.

That Internal Affairs was investigating a complaint against Detective Heishman based on her previous altercation with Cook is a closer call. The trial court noted that Garland identified this as the most important omission from the affidavit. And, the trial court carefully considered whether that statement would have been sufficient to negate probable cause. The trial court noted that the magistrate would not have disregarded everything in the affidavit just because of Detective Heishman's potential bias. We follow the trial court's sound reasoning. It is unlikely that a magistrate would have completely disregarded Detective Heishman's entire statement in the affidavit—including her compelling statement that Frye had said Cook was hiding Garland[18]—because of alleged and unsubstantiated bias.

Garland also argues that the trial court erred when it concluded that the unlawfully seized evidence was admissible as impeachment evidence, because LaChapelle opened the door to that evidence. Because we hold that there was sufficient probable cause to support the search warrants, we need not consider the trial court's alternative analysis regarding whether the evidence was admissible for impeachment purposes. The evidence was legally discovered, and the trial court had already declined to suppress the evidence based on the legality of the search.

We conclude that Garland failed to demonstrate that there was a legally meritorious issue that his appellate counsel should have raised in his direct appeal.

---

[18] The validity of Detective Heishman's statement that Frye said Cook said she was hiding Garland was directly challenged at the Franks hearing when Frye denied that he made this statement. But, that information does not impact this court's evaluation of whether the magistrate could find sufficient probable cause at the time it issued the warrants.

Therefore, we hold that Garland's appellate counsel was not ineffective for failing to raise claims regarding the validity of the search warrants.

III. Gang Evidence

Next, Garland argues that the trial court erroneously admitted irrelevant and prejudicial gang evidence. He argues that the evidence was not relevant under ER 402 and that the court did not conduct the analysis required by ER 403 and ER 404(b). And, he argues that the error resulted in a complete miscarriage of justice.

Garland did not raise this issue in his direct appeal. But, in a PRP a petitioner is not automatically barred from raising a nonconstitutional issue not previously raised. In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). To prevail on collateral review on a claim of evidentiary error, a petitioner must show that the error constitutes a fundamental defect amounting to a miscarriage of justice. In re Pers. Restraint of Morris, 176 Wn.2d 157, 168, 288 P.3d 1140 (2012). This court reviews evidentiary rulings for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 750, 202 P.3d 937 (2009). A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds. State v. Depaz, 165 Wn.2d 842, 858, 204 P.3d 217 (2009).

Prior to trial, the trial court heard a motion relating to the State's desire to admit gang evidence. The State maintained that three witnesses would testify at trial that prior to the shooting, Garland pointed to a tattoo on his arm and said, " 'I'm a 26 Blocc Crip.' " The witnesses would also testify that Brock responded that gangs are stupid and that Garland responded to that angrily. The State initially stated that it sought to introduce evidence of Garland's affiliation with a gang to

prove Garland's motive. It then noted that it sought to admit additional evidence[19] not for purposes of gang membership, but rather because the evidence corroborated what the witnesses heard in the parking lot on the night of the incident. The trial court then asked the State why the tattoo was not by itself sufficient, and it sought clarification from the State as to whether it was seeking admission of the evidence for identity or motive purposes. The State responded that it was seeking admission of the evidence as motive. The trial court rejected this assertion, noting that the men were already involved in a confrontation by the time Garland allegedly showed his tattoo or made any gang-related comments. It noted that the evidence appeared to be prejudicial.

At that point, the State appeared to change its theory of admissibility. It noted that identity of the shooter had been challenged. To support its claims that the identity of the shooter was contested, the State cited to transcripts from the two mistrials, recent interviews it had conducted, and the fact that Garland's notice of defense was general denial and/or self-defense. The State also noted that what was said in the parking lot that night was contested.

Garland responded that the trial court should exclude the evidence, because there "is no such gang as the 26 Blocc Crips" and that Garland and his friends were only mocking gangs. Garland argued that any evidence suggesting he is in a gang is prejudicial, because no such gang exists. The trial court

---

[19] The State also sought to admit evidence found in Garland's bedroom. It sought to admit photos with group pictures of people throwing gang signs, a shirt that has "26 Blocc Cuz" airbrushed on the back of it, and a picture of Garland wearing the shirt at a party. It also sought to admit evidence of a "tattoo map" indicating that Garland wanted to get another tattoo of a drawing of a 26 gang sign.

responded, "So does the State then not even get in the statement that somebody heard about being a 26 Blocc Crip?" Garland responded that the State was entitled to admission of that statement, because it would come in as a statement of the defendant under ER 801(d)(2).

The trial court then asked Garland about whether the tattoos were admissible. Garland responded that the State could photograph the "2" and "6" tattoo on Garland's forearm and admit them at trial after laying the proper foundation. Eventually, Garland noted, "You know, they get the 26 in. They get the statement about the Crips, and to admit the other stuff is to basically suggest to the jury that this gang actually exists and it doesn't."

After additional argument from the State, the court stated:

> The linkage here is that there needs to be evidence brought in to show that he belongs to a gang, but what we're forgetting is what's the purpose of the gang evidence? We're jumping ahead of ourselves. There's two possible purposes. The first is identity, and I think there's no question that some linkage between Mr. Garland and the 26 Blocc Crips statement is admissible, even the Defense concedes that, and most directly is the 26 on his forearm, so I don't know how much more direct you can get than that which is stamped onto him, if you will.
>
> Once we move away from that to other evidence that shows he had some association with this 26 Blocc Crip gang or want to be gang or association or whatever it is, I think you run into a dangerous area because do you really need it for identity? It doesn't appear that that's the case.

The court noted the second possible purpose was motive, but it rejected this purpose, because the two men were already involved in a confrontation. The court ultimately concluded that it was going to allow the 26 Blocc Crip statement to come in and a photograph of Garland's forearms as long as the State could lay the proper

39

foundation. But, it did not see the need for the shirt or other evidence to come in.[20] It noted that if new evidence came in later and the State raised the issue again outside the presence of the jury, it would consider the issue again then.

During trial, witnesses testified as to Garland's statements on the night of the shooting. Marcy testified that when Garland and Brock were arguing, Garland said, " 'Nigga, this is 26th Street Crip. Fuck you.' " Marcy also testified that he heard a statement about " '[t]his is 26th Street.' " Valentine testified that as the argument between the men developed, Garland showed his tattoos and said "three, six Crip." Brock responded by saying, " 'fuck gangs, fuck you.' " Another witness testified that Garland said " '36 Crip' " right before the shots were fired.

When Garland testified, he claimed that Brock noticed his tattoo and asked him if he was one of the white boys from "3-6." Garland testified that he told Brock he was not anything called 3-6. Garland testified that his 26 tattoo was not a Crip reference, but rather a numeric code for "BF," meaning that he and LaChappelle were best friends.

After this testimony, the State moved to impeach Garland with evidence that his tattoos were gang references. Specifically, the State moved to admit Garland's

---

[20] After the court made its ruling, the State asked a clarifying question about whether a photograph of a tattoo on Garland's leg that said " '26 for life' " was admitted even though none of the witnesses saw it. The court noted that it could come in under the same theory, "If he's got a 26 on his body and there's evidence that the 26 was referenced by the person that did the shooting, then that comes in." Garland argued that it should not have come in, because the witnesses never saw the tattoo on his leg. The court responded, "That's not the point. The point is the linkage between the name or the identity of the 26 and the reference by the shooter. . . . It's a linkage. It's an identity thing." The trial court disagreed with Garland's assertion that the leg tattoo was cumulative.

shirt that said " '26 block cuz' " and a video in Garland's possession in which someone yelled out " '26 block Crips.' " Garland argued that the evidence was not relevant to show identity or prove motive. Garland noted that the jury did not need to see other evidence and that it needed to decide only whether Garland made the statement that he was a 26 Blocc Crip on the night of the incident.

After noting the potential probative value of the evidence—to corroborate the witnesses' stories on the night of the incident about what Garland and Brock said to each other—the trial court decided to reserve ruling on the issue until Garland further testified on cross-examination. It did so in order to better assess how directly the State's evidence would impeach Garland's statements. But, the trial court specifically noted that the State could ask Garland whether on the night of the incident he said that he was a 26 block crip. The court noted that if Garland said, "yes" the inquiry would end.

During cross-examination, the State asked Garland if he said he was a "26 block Crip" that night. After Garland admitted he said that, the State reminded the court to provide a limiting instruction.[21] And, the trial court provided one: "You have heard testimony regarding a statement reportedly made by the defendant wherein he said 26 Crips. You may consider this evidence to evaluate the credibility of witnesses. You are prohibited from using this evidence for any other purpose." Then, the State published the pictures of Garland's tattoos on his forearms and the State continued its questioning. The State asked Garland why he said he was a

---

[21] Garland had previously requested a limiting instruction, and the State agreed it was a good idea.

26 block crip. Garland responded that he said it, because Brock was asking him if he was one of the white boys from three six crip.

In his PRP, Garland argues that the trial court erred when it allowed "any gang evidence." Garland cites to the State asking Garland whether he said that he was a " '26 Block Crip' " on the night of the incident as improperly admitted evidence. In his supplemental briefing, Garland identifies additional pieces of evidence that he asserts improperly suggested that Garland had some affiliation with an alleged gang.

First, he cites to Valentine's testimony that Garland said, " 'three, six crip' " and pointed to a tattoo on his arm. He also points to Valentine's testimony that a "crip" is a gang member and that Valentine understood that was how Garland was communicating that statement. Garland also cites to Valentine's testimony on cross-examination. During Garland's cross-examination of Valentine, Valentine testified that during his police interview, he told the police that Garland referred to a "set" on the night of the incident. Valentine testified that a "set" is a group of gangs. Finally, Garland cites to Marcy's testimony[22] that Garland said, "Nigga, this is 26th Street Crip. Fuck you."

Therefore, the evidence Garland argues was improperly admitted amounts to only testimony about Garland's alleged statements on the night of the incident, not the admission of any additional gang-related extrinsic evidence or the photos

---

[22] Garland cites to evidence from trial on September 15, 2009 that he claims was improper gang affiliation evidence. But, the report of proceedings page number he cites does not correspond with any proceedings held on that day. However, Marcy did testify that day and referenced the 26th Street Crip.

of Garland's forearm tattoos. The admission of these alleged statements was already considered by the court pretrial. The trial court admitted the statements at that point because identity was at issue at that stage of the proceedings. And, Garland conceded that testimony about Garland's statements on the night of the incident could come into evidence.

Moreover, during trial, Garland did not object when witnesses testified as to Garland's statements. And, during the State's cross-examination of Garland, Garland fought to exclude extrinsic gang evidence, but did not argue against, or object to, the admission of Garland's statements. After Garland testified that he said that he was a "26 block Crip" on cross-examination, and he was provided with a limiting instruction.

On appeal, a party may not raise an objection not properly preserved at trial absent manifest constitutional error. State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). Although Garland notes that affiliation with a gang is protected by the First Amendment, he fails to show how admission of his statements on the night of the incident constitutes manifest constitutional error. Therefore, Garland has not properly preserved this issue for appeal.

Even if Garland had properly preserved the issue for appeal, he would still need to show that the admission of the evidence resulted in a complete miscarriage of justice in order to raise this issue for the first time on collateral review. In re Pers. Restraint of Gomez, 180 Wn.2d 337, 347, 325 P.3d 142 (2014). Case law suggests that it is difficult for the petitioner to meet this burden for evidentiary errors. See In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 489, 965

P.2d 593 (1998) ("[E]ven if there was an evidentiary error with [] opinion testimony, such an error does not constitute a 'fundamental defect' amounting to a 'miscarriage of justice.'" (quoting In re Pers. Restraint of Cook, 114 Wn.2d 802, 811, 792 P.2d 506 (1990)); Morris, 176 Wn.2d at 171 (concluding that the petitioner cannot meet his burden to show that any evidentiary errors made by the trial court regarding the inadmissibility of certain subjects of proposed expert testimony resulted in complete miscarriage of justice).

Garland argues that there was a complete miscarriage of justice, because the admission of the gang-related evidence created a likelihood that jurors convicted on the basis of propensity evidence. Garland does not provide any authority to support his assertion that an evidentiary error of this nature—evidence creating a possibility that jurors convicted on the basis of propensity evidence— constitutes a miscarriage of justice per se. Therefore, Garland failed to satisfy his burden of showing that the admission of the evidence resulted in a complete miscarriage of justice.

We hold that Garland's evidentiary challenge is without merit.

IV. Inconsistent Verdicts

Garland asserts that he should be given a new trial or released from custody, because his verdicts were inconsistent. Garland argues that his second degree manslaughter, second degree murder, and second degree assault verdicts were inconsistent, because the State was allowed to argue transferred intent to the jury under one of the jury instructions. .

Garland does not explain why he is entitled to collateral review of this issue. Moreover, it is unclear from the record whether Garland objected at trial to either the jury instruction or to the jury verdicts as inconsistent. Failure to object to inconsistent jury verdicts at trial can result in waiver of the right to raise that objection on appeal. See State v. McNeal, 145 Wn.2d 352, 355, 37 P.3d 280 (2002) (concluding that because the alleged inconsistency in the jury verdict was not a manifest error affecting a constitutional right, it could not be raised for the first time on appeal).

Even assuming Garland is entitled to review of this issue, Garland does not argue that the jury instruction itself was error nor does he explain how the transferred intent argument and jury instruction resulted in an inconsistent verdict.[23] Without explanation, Garland cites to State v. Wilson, 125 Wn.2d 212, 883 P.2d 320 (1994) and State v. Clinton, 25 Wn. App. 400, 606 P.2d 1240 (1980) to support his argument.

In Wilson, the defendant fired shots into a bar, intending to shoot the bartender and a specific bar patron. 125 Wn.2d at 213-14. But, Wilson's shot missed his intended victims and instead struck two unintended victims. Id. The Washington Supreme Court considered whether a specific statute allows intent to be transferred to unintended victims once the intent to inflict great bodily harm against an intended victim is established. Id. at 214. The Wilson court did not consider whether Wilson's verdict was inconsistent.

---

[23] Neither the jury instruction to which he refers nor the verdict form is in the record.

45

In Clinton, the principal issue was whether the trial court erred in providing a specific transferred intent jury instruction. 25 Wn. App. at 401. Clinton argued that the trial court's transferred intent instruction was misleading and inconsistent with other instructions. Id. at 402. But, the Clinton court did not consider whether Clinton's verdict was inconsistent.

Inconsistent verdicts present a situation where error, in the sense that the jury has not followed the court's instructions, most certainly has occurred. State v. Goins, 113 Wn. App. 723, 730, 54 P.3d 723 (2002), aff'd, 151 Wn.2d 728, 92 P.3d 181 (2004). Here, even assuming Garland has not already waived his argument that his verdicts were inconsistent, and even assuming Garland is able to bring this challenge now in a PRP, we hold that Garland's argument fails, because he has not provided relevant authority to support the fact that his verdicts were inconsistent. See RAP 16.10(d) (stating that the content of PRP briefs are governed by RAP 10.3); 10.3(a)(6) (stating that arguments must be supported by citations to authority); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 547 (1992) (stating that arguments not supported by authority will not be considered).

## V. Attorney's Withdrawal

Garland argues that he should be given a new trial or released from custody, because the trial court did not make the necessary inquiry before allowing his attorney to withdraw before sentencing. Because the withdrawal of counsel implicates a defendant's constitutional right to counsel, Garland must prove that

any error here resulted in actual and substantial prejudice. See Gomez, 180 Wn.2d at 347.

On June 8, 2010, after Garland was convicted, but before he was sentenced, the trial court noted that Garland had indicated he wanted to have Corey, his attorney, removed from the case. Garland confirmed for the trial court that he wished to have Corey removed. The trial court also noted that Corey indicated she had a conflict that required her to withdraw. The State requested that the trial court go forward with sentencing and deny Corey's motion to withdraw. Corey responded that she wished to inform the court about the nature of her conflict outside of Garland's presence in an in-camera hearing. She noted that her conflict was based on an ethical concern.

The trial court conducted an in-camera meeting with Corey and the court reporter. After conducting the in-camera hearing, the court found that there was a reasonable belief by Corey that she had a conflict of interest and that her belief would compromise her ability to zealously represent Garland. Garland was represented by a different attorney during sentencing.

Garland argues that the trial court erred by never making an inquiry into the nature of the conflict and the grounds for the substitution of counsel before allowing Corey to withdraw. But, the trial court did inquire into the nature of the conflict during the in-camera hearing.[24] Moreover, Garland does not indicate how he was

---

[24] Garland argued in his supplemental opening brief that the trial court infringed on his right to be present for all critical stages of a trial by holding a secret in-camera hearing in Garland's absence. But, Garland withdrew any argument related to his presence during the in-camera hearing in his reply brief.

actually and substantially prejudiced by Corey withdrawing prior to sentencing. Therefore, we conclude that Garland's argument is without merit.

VI. <u>Cumulative Error Doctrine</u>

Finally, Garland argues that his convictions must be reversed because of the cumulative error doctrine.

In a PRP alleging cumulative error, the petitioner bears the burden of showing multiple trial errors and that the accumulated prejudice affected the outcome of the trial. <u>In re Pers. Restraint of Cross</u>, 180 Wn.2d 664, 690-91, 327 P.3d 660 (2014). Here, the trial court made no errors. We hold that the cumulative error doctrine does not apply.

We deny the petition.

WE CONCUR: