[No. 16868-9-III.  Division Three.  May 25, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSHUA JAY NASON, *Appellant*.

688

*Scott A. Niebling*, for appellant.

*James R. Sweetser, Prosecuting Attorney*, and *Janet G. Gemberling, Deputy*, for respondent.

BROWN, J. — The jury found Joshua Nason guilty of first degree child assault. Mr. Nason's appeal presents three issues. (1) Did the trial court fail to enforce an earlier plea agreement with a "no other charges" provision? (2) Was a Child Protective Services (CPS) investigator a "state agent" who failed to give pre-statement warnings? (3) Was the unanimity instruction given adequate? We decide the court correctly concluded no contract was formed rendering the plea agreement inapplicable. The CPS worker

functioned as a state agent; however, the error admitting Mr. Nason's statement was harmless. Finally, the unanimity instruction was appropriate. Accordingly, we affirm.

## FACTS

In August 1996, C.M. reported allegations of physical abuse and neglect of her grandson, D.H., to CPS in Spokane. CPS investigator Joseph Armstrong began an inquiry into the allegations which included burning, bruising, and biting.

At about the same time, Joshua Nason, D.H.'s father, was arrested on six unrelated informations. The offenses pertained to property crimes, delivery of a controlled substance, and malicious mischief. A few days later, on September 3, 1996, after learning of Mr. Nason's incarceration from the police, Mr. Armstrong interviewed Mr. Nason about the dependency matter in order to prepare a fact-finding report.

During the jail interview, Mr. Nason, after inquiry, admitted that he had inflicted bite marks on D.H. as part of a game. Although the police had informed Mr. Armstrong that Mr. Nason was incarcerated, he did not notify the police prior to his meeting that he would be talking with Mr. Nason. Thereafter, however, Mr. Armstrong told the police, after their inquiry, about the interview. Mr. Armstrong did not give Mr. Nason the warnings of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

In the fall of 1996, Mr. Nason's defense counsel negotiated a plea agreement with the deputy prosecutor on the charges that led to his arrest. On December 5, 1996, Mr. Nason entered a guilty plea on all the charges. The plea agreement partly stated "No Other Charges Will Be Filed" after listing cases the particular offense was to run concurrent with.

In a declaration, the deputy prosecutor who handled the six charges asserted this meant the State would not file

any charges arising out of the files on which she was working. The deputy prosecutor was not aware of any allegations involving first degree child assault when she negotiated the plea. In the caption of each of the six informations is a reference to a specific police investigation file related to the particular charge.

About 12 days after his plea, Mr. Nason was charged in district court with first degree assault of a child. Mr. Nason sought specific performance of the plea agreement and the dismissal of the later filed charge. The trial judge found no meeting of the minds on the term "No Other Charges Will Be Filed" existed, held no contract was formed, and denied the motion to dismiss.

A CrR 3.5 hearing was held regarding the statements Mr. Nason made to Mr. Armstrong. The trial court held Mr. Nason's statements were admissible. The court reasoned Mr. Armstrong's questioning was a custodial interrogation but Mr. Armstrong was not a state agent, thus the statement was admissible.

At trial, the court ruled the State did not have to elect which of multiple acts was the principle assault. Rather, the court gave a standard unanimity instruction to the jury that informed the jury it had to unanimously determine which act was the principal assaultive act. The jury returned a verdict of guilty. Mr. Nason appealed.

ANALYSIS
A. Contract

The issue is whether the trial court erred by refusing to enforce the plea agreement's "no other charges" provision and concluding the parties did not have a contract.

■ ■ " 'Plea agreements are contracts.' " *State v. Sledge*, 133 Wn.2d 828, 838, 947 P.2d 1199 (1997) (quoting *State v. Mollichi*, 132 Wn.2d 80, 91, 936 P.2d 408 (1997)). A contract is not formed unless there is mutual assent between the contracting parties. *Ottgen v. Clover Park Technical College*, 84 Wn. App. 214, 219, 928 P.2d 1119 (1996).

Mutual assent must be gathered from the outward expression of the parties and not their unexpressed subjective intention. *See City of Everett v. Estate of Sumstad*, 95 Wn.2d 853, 855, 631 P.2d 366 (1981). We impute an intention corresponding to the reasonable meaning of a party's words and acts. *Id.*

■■ When each party has a different understanding of a material term, a basis exists for a court to find no contract was formed. *See Swanson v. Holmquist*, 13 Wn. App. 939, 943, 539 P.2d 104 (1975). In accordance with this principle, the RESTATEMENT (SECOND) OF CONTRACTS, section 20(1) (1979), provides: "There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and (a) neither party knows or has reason to know the meaning attached by the other."

When there is uncertainty of meaning in the terms of the promise that the court cannot resolve, the promise is fatally ambiguous and void. *Peoples Mortgage Co. v. Vista View Builders*, 6 Wn. App. 744, 748, 496 P.2d 354 (1972); *see Flower City Painting Contractors, Inc. v. Gumina Constr. Co.*, 591 F.2d 162, 164-65 (2d Cir. 1979). A court may look to parol evidence to explain the ambiguity and, if the meaning remains unclear, no contract is formed. *Peoples Mortgage*, 6 Wn. App. at 748. Questions of whether an ambiguity in a contract exists and the legal effect of a contract are issues of law reviewed de novo. *See Clevco, Inc. v. Municipality of Metro. Seattle*, 59 Wn. App. 536, 539, 799 P.2d 1183 (1990), *review denied*, 117 Wn.2d 1006 (1991).

Here, the parties manifested the intent that "No Other Charges Will Be Filed." The State argues that the term applied solely to those cases that the deputy prosecuting attorney was handling for the State, inferring by custom and common understanding that the "other charges" must be related to the present charges arising from the corresponding police investigations. These case numbers were listed in section (f) of the plea agreement with the disputed term.

Mr. Nason, by contrast, claims he intended to preclude all other charges currently pending because of the high of-

fender score he would receive if sentenced on any further charge. Either of these interpretations is a plausible reading of the term "no other charges." In this situation, an ambiguity exists. *See Flower City Painting*, 591 F.2d at 164-65 (ambiguity was present where the parties' different interpretations of a contract were plausible).

Turning to extrinsic evidence, the deputy prosecutor intended the term to include only those charges arising from the pending files on which she was working. This meaning differs materially from the meaning Mr. Nason attached to the term. Furthermore, neither party has contended that the other knew or had reason to know of each other's intent. It follows that no contract was formed: "[T]he contracting parties here had different understandings of a material portion of the agreement. Since the document did not reflect a common understanding of an essential term of the agreement, that is, did not reflect a mutual intent or mutual assent to the term, there was no contract." *Swanson*, 13 Wn. App. at 943. Moreover, taken literally, Mr. Nason's position would lead to a conclusion that the provision gave a lifetime grant of immunity for all crimes, both past and present, a result clearly not intended.

Because there was no contract, Mr. Nason is not entitled to specific performance. *See Brock v. Wright*, 98 Or. App. 323, 778 P.2d 999 (1989) (where the defendant and prosecutor attached two different meanings to the term "cooperate" in the plea agreement, there was no meeting of the minds and thus no plea agreement to specifically enforce). The trial court did not err when it declined Mr. Nason's request for specific performance.

## B. Statement

The issue is whether the trial court erred by admitting Mr. Nason's statement to Mr. Armstrong and concluding it did not violate CrR 3.5.

██ "*Miranda* warnings are designed to protect a defendant's right not to make incriminating statements while

in the potentially coercive environment of custodial police interrogation." *State v. D.R.*, 84 Wn. App. 832, 835, 930 P.2d 350, *review denied*, 132 Wn.2d 1015 (1997). The *Miranda* warnings are required when an interview or examination is (1) custodial (2) interrogation (3) by a state agent. *State v. Post*, 118 Wn.2d 596, 605, 826 P.2d 172, 837 P.2d 599 (1992) (citing *State v. Sargent*, 111 Wn.2d 641, 649-53, 762 P.2d 1127 (1988)). If a defendant did not receive the *Miranda* warnings, any statements made during a custodial interrogation are presumed to be involuntary. *See Sargent*, 111 Wn.2d at 648.

■ The State does not dispute that there was a custodial interrogation. The issue is thus whether Mr. Armstrong was a "state agent" for the purpose of the *Miranda* warnings. In *Cates v. State*, 776 S.W.2d 170, 171 (Tex. Cr. App. 1989), an investigator for the Department of Human Resources interviewed the defendant in the county jail and obtained admissions from him that were introduced at trial. The investigator did not give the defendant *Miranda* warnings prior to the interview. Although the investigator had not acted at the behest of law enforcement officials, the court held the statements were inadmissible because she was acting as a state agent with the duties to discover child abuse and turn the information over to law enforcement. *Id.* at 173-74; *see also Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981) (defendant's incriminating statements to a court-appointed psychiatrist were inadmissible in a sentencing hearing where defendant was not advised of his *Miranda* rights).

We conclude Mr. Armstrong's conduct was similar to that of the investigator in *Cates*. As in *Cates*, Mr. Nason's admissions were the result of Mr. Armstrong's attempt to gather evidence of abuse, and Mr. Armstrong also had a duty to turn over evidence of child abuse to law enforcement officials. Finally, as in *Cates*, Mr. Armstrong did report Mr. Nason's incriminating statements to law enforcement officials.

Additionally, we note that after the interview a law

enforcement inquiry was directed to Mr. Armstrong about what was said and that Mr. Armstrong was first informed of Mr. Nason's incarceration by law enforcement. Although suggestive that Mr. Armstrong was acting as a state agent, we need not draw this additional inference from these circumstances to conclude Mr. Armstrong was a state agent.[1]

The fact that, unlike in *Cates*, Mr. Armstrong was investigating Mr. Nason for a civil proceeding does not change the result. In *Mathis v. United States*, 391 U.S. 1, 4, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968), the defendant was in prison on unrelated charges. During a routine tax investigation, a government investigator interviewed the defendant without giving him the *Miranda* warnings. The Supreme Court held that the interview violated the defendant's Fifth Amendment rights. It reasoned that although a tax investigation may be initiated for the purpose of a civil action, tax investigations frequently lead to criminal prosecutions. *Id.* at 4. Furthermore, a criminal prosecution did in fact begin eight days after the interview with the defendant. *Id.*

Here, although Mr. Armstrong was investigating Mr. Nason for the purpose of a dependency action, Mr. Armstrong was required to disclose incriminating evidence to law enforcement officials. As in *Mathis*, a criminal prosecution could, and did, arise shortly after the interview and the prosecution relied in part on evidence gathered by Mr. Armstrong. Mr. Armstrong was not caring for the interests of Mr. Nason or acting as his agent or representative, rather Mr. Armstrong owed his allegiance to the State. Thus, on balance the record indicates Mr. Armstrong acted as a state

---

[1]Unlike *Cates*, other jurisdictions have emphasized the importance of prior contact between a social worker and law enforcement officials in finding the social worker was a state agent for *Miranda* purposes. *See State v. Morrell*, 108 N.C. App. 465, 424 S.E.2d 147 (social worker was an agent of the state where she began working with the police prior to interviewing the defendant), *review and cert. denied*, 333 N.C. 465, 427 S.E.2d 626 (1993); *People v. Kerner*, 183 Ill. App. 3d 99, 538 N.E.2d 1223, 131 Ill. Dec. 667 (child welfare investigator was state agent where he exchanged information with police before and after the interview with the defendant), *appeal denied*, 127 Ill. 2d 629, 545 N.E.2d 122, 136 Ill. Dec. 598 (1989), *cert. denied*, 493 U.S. 1073 (1990).

agent and was required to give Mr. Nason his *Miranda* warnings prior to questioning him. The trial court erred when it admitted his testimony. Our inquiry is not over because the error must affect the outcome.

■ "A court's error in admitting a defendant's statement in violation of *Miranda* is harmless only 'if the untainted evidence alone is so overwhelming that it necessarily leads to a finding of guilt.' " *D.R.*, 84 Wn. App. at 838 (quoting *State v. Ng*, 110 Wn.2d 32, 38, 750 P.2d 632 (1988)). Here, the untainted evidence leads to a finding of guilt. The bite marks were a small part of the evidence against Mr. Nason. Burning and assorted bruising were also present. Multiple witnesses connected Mr. Nason to these additional injuries. Mr. Nason denied any role in the other abuse but admitted to inflicting the bite marks, dismissing the conduct as "love bites" or "feelers" that were part of a harmless game.

Furthermore, Mr. Armstrong's testimony was similar to other testimony. C.M., D.H.'s grandmother, testified Mr. Nason inflicted the bite marks on D.H. and that he burned D.H. D.H.'s mother testified Mr. Nason bit and burned D.H. She also testified she saw Mr. Nason hit D.H. in the back of the head. Finally, Mr. Nason testified about the "feelers." He admitted to biting D.H. although he denied leaving bite marks. He attempted to dispel the State's efforts to show intentional assault by dismissing the bite marks as simply the unintended residue of a game. Thus, his testimony was a component of his defense.

## C. Unanimity Instruction

■ The issue is whether the trial court erred because it did not instruct the jury that it must unanimously find which act constituted the intentional assault causing substantial bodily harm. Mr. Nason contends first degree child assault has two conceptually distinct elements, an intentional assault and a previous pattern of assault causing bodily harm.

Mr. Nason was charged with one count of first degree as-

sault of a child under RCW 9A.36.120(1)(b)(ii)(A). This statute provides in part:

> (1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:
>
> . . . .
>
> (b) Intentionally assaults the child and . . . .
>
> . . . .
>
> (ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks
> . . . .

Mr. Nason contends the trial court erred because it failed to instruct the jury that it must unanimously find which act constituted the intentional assault causing substantial bodily harm under RCW 9A.36.120 as opposed to the prior pattern or practice causing bodily harm.

Where multiple acts are alleged and any one of them could constitute the charged crime, the jury must be unanimous as to which act constitutes the crime. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). "To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id.* "The proper standard of review for constitutional error is 'harmless beyond a reasonable doubt.' " *Id.* at 405 (citing *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986)).

Division One has already addressed the question presented here in *State v. Kiser*, 87 Wn. App. 126, 940 P.2d 308 (1997), *review denied*, 134 Wn.2d 1002 (1998). As the *Kiser* court explained, the statute does not require such a separate finding by the jury:

RCW 9A.36.120(1)(b) requires proof of a principal intentional assault which causes substantial bodily harm, *and* a previous pattern or practice of causing pain. The crime thus is defined not by a single act, but by a course of conduct. The definition of the crime permits the State to charge an entire episode of assaultive conduct as one count. The jurors must all find a principal act resulting in substantial bodily harm preceded by a pattern or practice of other assaultive acts. But it is not necessary for all jurors to agree on what act was the principal assault.

*Id.* at 130.

Furthermore, in *Kiser* the defendant assigned error because the trial court failed to instruct the jurors that they must unanimously agree on which of the multiple assaults constituted the principal assault. *Id.* at 129. Here, the trial court gave an instruction conforming to *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984):

There are allegations that the defendant committed acts of intentional assault which caused substantial bodily harm on multiple occasions. To convict the defendant, one or more particular acts must be proved beyond a reasonable doubt and you must unanimously agree as to which act or acts have been proved beyond a reasonable doubt. You need not unanimously agree that all the acts have been proved beyond a reasonable doubt.

Thus, the court instructed on this very issue and there was no error.

## CONCLUSION

We hold the trial court did not err by refusing to enforce the plea agreement and concluding that no contract had been formed. The trial court erred when deciding that Mr. Armstrong was not a state agent under these circumstances for the purposes of applying the *Miranda* standards. However, the error was harmless in light of the record. Finally, the trial court did not err when giving its unanimity instruction.

Affirmed.

KURTZ, A.C.J., and SWEENEY, J., concur.

Reconsideration denied August 5, 1999.

Review denied at 139 Wn.2d 1023 (2000).