IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83212-3-I |
| Respondent,<br>v. | DIVISION ONE |
| THERESA L. SHELTON, a/k/a<br>TERESSA L. SHELTON, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Lisa West named Theresa Shelton as the executor of her will and gave her sensitive personal information. Shelton used the information to open two lines of credit and charged approximately $13,000 on one of them, an American Express credit card, without West's knowledge or permission. A jury found Shelton guilty of identity theft and she received a three-month sentence. Shelton appeals, contending that the trial court erred by (1) failing to give an instruction that guaranteed a unanimous verdict (2) admonishing Shelton to stop nodding in agreement with her attorney during closing argument, and (3) failing to enter written findings of facts and conclusions of law under CrR 3.5 and 3.6.

The trial court did not err by failing to instruct the jury that it must unanimously agree which act formed the basis of the identity theft charge because the State affirmatively elected to rely on the American Express card, rather than the other credit line Shelton opened. Also, the trial court did not make a judicial comment on the evidence. Rather, it properly exercised its

discretion to stop Shelton from agreeing with her counsel's statements of fact. Finally, we agree with Shelton that the trial court erred when it failed to record its written findings, but conclude that its detailed oral findings make the error harmless. We therefore affirm.

FACTS

Shelton and West met while working together in Las Vegas, Nevada and remained close friends for nearly 20 years. After Shelton moved to Kirkland, Washington, the friends stayed in touch and West often stayed with Shelton for long visits. In 2016, West moved to Mexico and began using Shelton's home address as her mailing address and on her driver's license. A year later, West drafted a new will and listed Shelton as her executor. West subsequently added Shelton's name to her Chase bank account and gave Shelton all the relevant personal information needed to access her financial accounts, including her social security number. West testified that her intention was for Shelton to use this information only in her role as executor, not for personal reasons. Shelton asserted at trial, relying on her statements to law enforcement during the investigation, that she believed she could access funds and open credit cards in West's name "for emergency purposes."

In September 2017, about five months after losing her job, Shelton borrowed $12,000[1] from West. West insists that she loaned the money to Shelton on the condition that she pay it back within a year.

---

[1] West made a $10,000 loan to Shelton for Shelton's house, plus another $2,000 for Shelton's son's car.

In October 2017, West visited Shelton's home, where Shelton disclosed that she had opened a Citibank credit card in West's name. Shelton had not used the Citibank card and West did not close the Citibank account at that time.

During the visit, their relationship began to deteriorate as constant bickering over household chores and the $12,000 loan became the norm. West left Shelton's home in January 2018 due to their falling out and called Citibank to cancel the credit card. Citibank advised West to contact the credit bureaus. The credit bureau West contacted informed her that an American Express (Amex) account had been opened in her name and that $13,130.53 had been charged to that account between July 14 and December 20, 2017. The charges included living expenses such as gas, groceries, and restaurant bills, as well as recreational expenses like Ed Sheeran concert tickets. West reported this activity as fraudulent to Amex.

Several weeks later, West reported the activity to Officer Glenn Shackatano of the Kirkland Police Department.[2] During that conversation, in addition to reporting the fraudulent credit activity, she also implied that Shelton had taken the $12,000 from her bank account without permission, rather than receiving it as a loan. Officer Shackatano contacted Shelton, who acknowledged that there was an Amex card in both their names but asserted that she had permission to use it "for emergency purposes." The case was transferred to

---

[2] Mr. Shackatano is now a firefighter with the city of Kirkland. We refer to him in this opinion as Officer Shackatano because he acted in that role during the relevant events.

Derrick Hill, a detective from the Kirkland Police Department, who filed a warrant to obtain Amex records and spoke with West over the telephone, but did not speak with Shelton.

The State charged Shelton with identity theft in the first degree. Before trial, Shelton moved to suppress both her telephone conversation with Officer Shackatano and the Amex records. Shelton alleged that because she was not read her *Miranda*[3] rights, her telephone conversation was inadmissible. Shelton also alleged that there was no probable cause for the search warrant used to obtain Amex records, making the records inadmissible. The trial court, however, found that *Miranda* warnings were not required because the conversation was conducted over the phone and there was no evidence of coercion. The trial court also found that there was probable cause for the warrant because the Amex account existed in West and Shelton's names but West denied opening it. The trial court's findings were oral, and were not reissued in writing.

During trial, the court briefly interrupted the defense's closing argument to admonish Shelton for nodding her head in agreement with her counsel's statements concerning the facts of the case. The jury found Shelton guilty as charged and Shelton was sentenced to a total of 90 days—seven days in the King County Jail and 83 days on electronic home detention. Shelton timely appeals.

---

[3] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (requiring law enforcement to inform an individual of their right to counsel and their right to remain silent before engaging in a custodial interrogation).

ANALYSIS

Shelton raises three issues. First, she asserts that the State failed to clearly elect the Amex card as the basis of the theft charge and the trial court violated her constitutional right to a unanimous jury verdict by not giving a clarifying instruction. Second, she contends that the trial court made an improper comment on the evidence when it interrupted defense counsel's closing argument to admonish Shelton not to shake her head. Third, she claims that the trial court erred by failing to record written findings of fact and conclusions of law required by Criminal Rule (CrR) 3.5(c) and CrR 3.6(b). For these reasons, Shelton requests that her conviction be reversed.

We conclude that the trial court did not violate Shelton's right to jury unanimity. The State clearly identified the Amex card as the basis of the identity theft charge throughout the trial. Also, the jury could not have been confused which card—Citibank or Amex—formed the basis of the charge when an Amex employee testified, ten exhibits admitted at trial pertained to the Amex card, and even defense counsel agreed "[w]e're here for the American Express." Citibank by contrast was only the subject of one exhibit, did not have a dedicated witness, and was not the focus of counsel during closing argument.

We also conclude that the trial court's admonishment of Shelton was not a judicial comment on the evidence. The trial court properly exercised its discretion when it instructed Shelton to stop nodding along with her counsel's

5

argument and in doing so did not comment on the evidence. The trial court was brief, polite, and justified.

Lastly, we conclude that, despite the court's failure to enter written findings of fact and conclusions of law pursuant to CrR 3.5 and 3.6, the error was harmless. The error was harmless because the oral findings were clear and detailed and the record was transcribed, which allows for review. Additionally, Shelton did not demonstrate how the lack of written findings harmed her.

<u>Jury Unanimity</u>

The trial court's decision not to instruct the jury on which act—opening a line of credit either with Citibank or with Amex—constituted the basis of Shelton's theft charge was not error. The evidence presented at trial and the State's closing argument made it clear which credit card was the subject of the identity theft charge, making jury confusion unlikely.

Both the United States and Washington constitutions guarantee criminal defendants the right to a unanimous jury verdict. <u>Ramos v. Louisiana</u>, ___ U.S. ___, 140 S. Ct. 1390, 1391, 206 L. Ed. 2d 583 (2020) (citing U.S. CONST. amend. VI); <u>State v. Armstrong</u>, 188 Wn.2d 333, 340, 394 P.3d 373 (2017) (citing WASH. CONST. art. I, § 21). The issue of jury unanimity may be raised for the first time on appeal as manifest constitutional error. <u>Armstrong</u>, 188 Wn.2d at 339 (deciding a party may raise issues of " 'manifest error affecting a constitutional right' " for the first time on appeal) (quoting <u>State v. Jorgenson</u>, 179 Wn.2d 145, 150, 312 P.3d 960 (2013)); <u>see</u> RAP 2.5(a)(3). As a constitutional issue, jury

6

unanimity is reviewed de novo. Armstrong, 188 Wn.2d at 339; see also State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007).

Where multiple acts could constitute the crime charged, the jury must be unanimous as to which act it relied on to support the conviction. State v. Marko, 107 Wn. App. 215, 220, 27 P.3d 228 (2001). There are two ways to ensure jury unanimity in multiple acts cases. The first is for the State to "elect the act on which it will rely for conviction," and the second is for the trial court to "instruct the jury that all of them must agree that the same act has been proved beyond a reasonable doubt [i.e., giving a "*Petrich*" instruction]."[4] Marko, 107 Wn. App. at 220 (citing State v. Petrich, 101 Wash.2d 566, 570, 572, 683 P.2d 173 (1984)); see also State v. Nason, 96 Wash. App. 686, 981 P.2d 866 (1999). An election "can be made by the prosecuting attorney in a verbal statement to the jury as long as the prosecution 'clearly identifie[s] the act upon which' the charge in question is based.' " State v. Carson, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015) (quoting State v. Thompson, 169 Wn. App. 436, 474-75, 290 P.3d 996 (2012)). When the evidence tends to show only those acts elected by the state, an election "arguably [is] not even necessary." Carson, 184 Wn.2d at 228.

---

[4] "The [State] [County] [City] alleges that the defendant committed acts of (identify crime) on multiple occasions. To convict the defendant [on any count] of (identify crime), one particular act of (identify crime) must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of (identify crime)." 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25 (5th Ed 2021).

In Thompson, where acts against two victims could have supported conviction, the court found that election occurred when the State's closing argument specifically mentioned the name of one of the victims. 169 Wn. App. at 474. The court in Carson found that election occurred when the State's closing argument identified three acts supporting three charges that it wanted the jury "to focus on for the purposes of [their] deliberations." Carson, 184 Wn.2d at 228. Conversely, where two assaults could have supported the charge, the court in Williams found no election when evidence demonstrating each was introduced, and the State emphasized one over the other in closing, but mentioned both and did not expressly rely on only one. State v. Williams, 136 Wn. App. 486, 497, 150 P.3d 111 (2007).

Here, similar to Thompson and Carter, the State clearly elected the Amex card as the basis of the charge in closing argument when the prosecutor said: "We're here about the American Express [card]." The State's closing PowerPoint slideshow also clearly referenced the Amex card as the basis of its analysis. Specifically, in its slide entitled "Intent to commit a Crime," the list of evidence supporting intent included "[c]ard purchases over $13,000." Because Shelton did not use the Citibank card, this could have only applied to the Amex card. Although the State did mention the Citibank card once during closing, the statement was, in context, only meant to explain how West discovered the Amex card and why it took her so long to discover it. The State said: "She made a fraud statement to—to the Citibank fraud department."

8

Defense counsel, during closing, also focused on Amex, saying "We're here for the American Express." Defense counsel then analyzed the to-convict instruction for identity theft as it applied to Shelton's opening and use of the Amex card. Defense counsel did mention the Citibank card, but only to undermine West's credibility concerning what she had or had not permitted Shelton to do with her personal information. Defense counsel said: "[West] was also aware of the Citibank card[] that [there was] no money charged on it [and] that she also called . . . on the 9th. She also knew about that back in October. Right? Yet, she waited. She waited until she got really mad at Theresa; right?"

More generally, jury confusion was unlikely because the evidence presented overwhelmingly referred to the Amex card instead of the Citibank card. During trial, the State presented Exhibits 1-10, which contained credit account history, correspondence, data account reports, and bank statements all linked to the Amex account—not the Citibank account. The State also provided testimony from an Amex employee—not a Citibank employee. The only Citibank exhibit is Exhibit 12, West's affidavit of fraud submitted to Citibank reporting that the account had been fraudulently opened. Defense counsel used the affidavit to attack West's credibility. In it, she presented her $12,000 loan to Shelton as acquired by fraud, despite later confessing that it had not been.

Shelton contends that the opening statements made by the State could have caused jury confusion. In its opening, the State said: "The Citibank card was opened and had a line of credit of approximately $5,000." Shelton's

contention is that jurors might apply this comment to jury instruction no. 11, which requires a jury to find "that the defendant obtained credit . . . in excess of $1,500." We disagree. Quickly after mentioning Citibank, the State continues: "Ms. West then learned that an American Express card had also been opened in her name." Read in the context of the entire opening, the State's references to Citibank is brief and used only to lay out the chronology of events.

Shelton contends that we should read Carson as requiring prosecution to not only specify the acts it is relying on, but also disclaim its intention to rely on other acts. She draws this rule from the Supreme Court's language in that case: "by specifying exactly three instances of sexual misconduct and disclaiming the State's intention to rely on other acts, the State effectively elected the acts on which the State sought a conviction." Carson, 184 Wn.2d at 229. A clarifying footnote reads: "[t]his latter element is essential to a clear election: the State must not only discuss the acts on which it is relying, it must in some way disclaim its intention to rely on other acts." Carson, 184 Wn.2d at 228 n. 15.

Even applying this more exacting test, the State successfully disclaimed the Citibank card. In Carson, the prosecutor explicitly told the jury what acts it did not intend to elect. 184 Wn.2d at 213. Here, the State did not make such an explicit statement. But when there are only two acts that could support a charge—the Amex and Citibank cards—we conclude that impliedly electing one act necessarily disclaims the other.

We hold the court did not err by declining to give a *Petrich* instruction because the State's election of the Amex card was clear.

### Judicial Comment

Shelton next alleges that the trial court made an improper comment on the evidence when it asked her to stop nodding in agreement to her counsel's closing arguments. We reject this claim because the Judge's statement to Shelton did not constitute an opinion and was a proper use of discretion.

Under Washington's constitution, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare law." WASH. CONST. art. IV, § 16. The purpose behind prohibiting judicial comments on the evidence "is to prevent the trial judge's opinion from influencing jury." State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995).

This constitutional provision is violated if a court's statements indicate to the jury the court's opinion concerning the truth or falsity of evidence or the court's lack of confidence in the integrity of a witness. State v. Lampshire, 74 Wn.2d 888, 892, 447 P.2d 727 (1968); see also Balandzich v. Demeroto, 10 Wn. App. 718, 725, 519 P.2d 994 (1974). Also, a trial court's statement amounts to a comment on the evidence if it is made " 'either directly or indirectly in such a way as to lead, or tend to lead, the jury to infer that such fact is an established one.' " Ewer v. Goodyear Tire & Rubber Co., 4 Wn. App. 152, 165, 480 P.2d 260 (1971) (quoting Haaga v. Saginaw Logging Co., 169 Wash. 547, 557, 14 P.2d 55 (1932)).

In <u>Lampshire,</u> the appellate court held that the trial court's comment was constitutionally impermissible when, after an objection to the materiality of the testimony, the judge said: "counsel's objection is well taken . . . I don't see the materiality."  74 Wn.2d at 891.  Dissimilarly, in <u>Balandzich</u>, the appellate court held that the trial court's comment was permissible when the judge told counsel: "Get the rest of the file here. . . . [Y]ou have to have the entire file, not what is favorable to you and leave the rest out."  10 Wn. App. at 724.

Here, Shelton nodded in agreement while her lawyer discussed whether she could use the Amex account for "emergency reasons" after she lost her job. When the Judge noticed this behavior, he stopped counsel briefly and said "I'm going to interrupt for just a moment.  So you may not nod your head during the closing argument.  Thank you very much."  There was no further interruption for the remainder of counsel's closing argument.

Unlike the judicial comment in <u>Lampshire</u>, this comment cannot be reasonably construed as an opinion on the truth or falsity of what counsel was saying, nor could it lead a juror to believe the fact is an established one.  The comment is more similar to <u>Balandzich</u> because it is more of an instruction than an opinion.

Not only did the trial court's comment not amount to an opinion, but it was proper use of its discretion. The trial court is generally granted wide discretion to control the course and conduct of a criminal trial because it is in the best position to perceive and structure its own proceedings.  <u>State v. Dye</u>, 178 Wn.2d 541,

547, 309 P.3d 1192 (2013). Judges are given especially "great latitude" when presiding and controlling the parties' closing arguments. State v. Woolfolk, 95 Wn. App. 541, 548, 977 P.2d 1 (1999) (quoting Herring v. New York, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975)).

Here, the trial court explained its decision to admonish Shelton when it said "So as you would state a fact, she would nod her head yes to that fact. So, it wasn't simply agreeing with your argument. She was—she was testifying to facts." This concern was well founded because nonverbal conduct " 'contains a testimonial component' " whenever the conduct reflects the "actor's communication of his thoughts to another." State v. Barry, 183 Wn.2d 297, 310, 352 P.3d 161 (2015) (quoting Pennsylvania v. Muniz, 496 U.S. 582, 595 n. 9, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990)). Shelton waived her right to testify. But by nodding while her attorney was speaking, she was essentially giving testimony without being subject to cross-examination.

We determine the trial court's remarks were constitutionally permissible and an appropriate use of discretion. Thus, we affirm the trial court's decision to deny the motion for a new trial.

## CrR 3.5 and 3.6

Finally, Shelton requests a retrial due to the trial court's failure to record in writing its findings of fact and conclusions of law pursuant to CrR 3.5 and 3.6. We conclude that remand is not necessary because given that there was an

13

adequate record for appellate review, the errors were harmless and did not prejudice Shelton.

Shelton filed and was denied two motions: (1) to suppress Shelton's statements to law enforcement, and (2) to suppress all Amex records. In the first, defense counsel contended that that Shelton's telephone conversation with Officer Shackatano was inadmissible because it amounted to custodial statements made without first receiving *Miranda* warnings. The court determined that a telephone conversation between a suspect and a police officer is not a custodial interrogation or inherently coercive and that defense counsel failed to show coercion or custody. In the second, defense counsel claimed the Amex records were inadmissible because they were obtained using a warrant not justified by probable cause. The court held that evidence of the account's existence and Ms. West saying she did not give anyone permission to open it was probable cause. On appeal, Shelton alleges that the trial court erred, thereby entitling her to a retrial, because the court's findings were not recorded in writing pursuant to CrR 3.5(c) and 3.6(b).

CrR 3.5(c) requires that a trial court "set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether [a] statement [made by the defendant] is admissible and the reasons therefor." CrR 3.6 similarly requires that the court's "findings of fact and conclusions of law" be recorded in writing for motions to suppress physical evidence and evidentiary hearings. CrR 3.6(b). The purpose of both

requirements is to ensure that the parties involved and the appellate court " 'be fully informed as to the bases of [the trial court's judgment].' " State v. Agee, 89 Wn.2d 416, 421, 573 P.2d 355 (1977) (quoting Roberts v. Ross, 344 F.2d 747, 751 (3d Cir. 1965)).

"Although a trial court's failure to make written findings and conclusions after a CrR 3.5 hearing is error, it is harmless as long as oral findings are sufficient to allow appellate review." State v. Thompson, 73 Wn. App. 122, 130, 867 P.2d 691 (1994) (denying retrial when oral findings were detailed and defendant failed to demonstrate prejudice). Similarly, "[a] court's failure to enter written findings of fact and conclusions of law following a suppression hearing as required by CrR 3.6 is harmless error if the court's oral opinion and the record of the hearing are 'so clear and comprehensive that written findings would be a mere formality.' " State v. Smith, 76 Wn. App. 9, 16, 882 P.2d 190 (1994) (quoting State v. Smith, 68 Wn. App. 201, 208, 842 P.2d 494 (1992)).

Here, in response to Shelton's motion to suppress the Amex records, the trial court said:

> So I'm going to find that there wasn't anything, based upon the alleged missing information from the affidavits that would have had any effect on any material item in the application for the search warrants.
>
> . . .
>
> So the motion to suppress the items obtained in the search warrant is denied.

Not only did the trial court clearly state its findings and decisions, but it provided a lengthy explanation about all the challenges raised in Shelton's motion. The

15

court explained (1) why the bank records alone were a sufficient basis for probable cause, (2) why West reporting the loan as theft did not damage her credibility, and (3) why the minimum payments to the account and West's drunken messages were not relevant to establish probable cause. By doing this, the court explicitly addressed each of the four reasons given by the defense as to why the evidence should be suppressed. In addition, the court asked whether it had failed to address any part of the motion, to which Shelton's attorney replied "no" before moving on.

In response to Shelton's motion to suppress her telephone conversation with Officer Shackatano, the trial court said: "In this hearing, I am going to find that there were—Ms. Shelton was not in custody . . . [a]nd, because of that, *Miranda* was not required, and there was nothing that would—of a constitutional magnitude that would call for the suppression of any of the alleged statements of Ms. Shelton." The trial court clearly stated its findings and decisions and provided a detailed explanation. And again, Shelton's attorney said "no" when the trial court asked if it had failed to address any part of the motion.

Lastly, the motions were heard August 25 and 30, 2021 and arguments and testimony were fully transcribed into the verbatim record. Because of this, we have all the information necessary for review and a clear understanding of the trial court's rulings. A lack of written findings absent prejudice is not grounds for reversal. Thompson, 73 Wn. App. at 130 (holding that there were no grounds for reversal when appellant did not explain how he was prejudiced by the late entry

16

of the written findings). For us to reverse, Shelton would need to demonstrate that she was prejudiced by findings inadequate to support review. But Shelton did not even attempt to establish prejudice, and so did not meet her burden.[5] Nor has she been prejudiced.

We conclude that the lack of written findings required by CrR 3.5 and 3.6 was harmless error. The trial court made clear and comprehensive oral findings and the entire hearing for both motions was transcribed and provided to this court, thereby creating a complete record with all the information necessary for adequate review.

We affirm.

Smith, C.J.

WE CONCUR:

Bowman, J.          Mann, J.

---

[5] Shelton may not have raised the issue of prejudice because no indication exists that the lack of written findings of fact and conclusions of law prejudiced Shelton in any way on appeal. Furthermore, Shelton utilized the testimony of Officer Shackatano to support her case in closing: "officer Shackatano said, 'well, yeah. She said that she had permission to use this card and it was to be used for emergency purposes.' " Given that, it might be contradictory to assert that the ruling was prejudicial.