[No. 32406-3-I.    Division One.    October 17, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ETHEL MAE
SMITH, *Appellant.*

*Neil Fox* of *The Defender Association*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Robert A. Knief, Deputy*, for respondent.

SCHOLFIELD, J. — Ethel Mae Smith appeals her conviction for possession of cocaine in violation of RCW 69.50.401. She argues that the warrantless search of her purse, which disclosed the cocaine, was neither "incident to arrest" nor an inventory search and, therefore, violated the Fourth Amendment and Const. art. 1, § 7. We affirm.

## FACTS

On August 12, 1992, Seattle Police Officers Richard Welch and Dag Aakervik observed Smith driving a car in Seattle. They had dealt with her before and knew she did not have a valid driver's license. They also believed that she had an outstanding felony warrant for failing to appear on a drug charge. In fact, there was an outstanding "no bail" warrant for a "probation hold" from a 1990 case.

Welch and Aakervik stopped Smith, placed her under arrest, and handcuffed her. The officers testified that Smith requested that she be allowed to retrieve her purse from her car. Officer Welch retrieved the purse from the front seat. The purse was not searched at the scene, and the car was not impounded. Aakervik stated that "an acquaintance of [Smith's] was in the area, and she gave the keys to this person."

Welch advised Smith of her *Miranda*[1] rights. He and Aakervik then took Smith to police headquarters. Aakervik testified that while he typed up the report, Welch "was doing the booking sheets and going through [Smith's] personal effects". Smith never requested that anybody come to pick up her purse.

Welch went through the contents of Smith's purse. The record does not indicate whether Smith was present during this search or in a holding cell. Welch testified

> It was a pretty cluttered purse with a lot of containers, so I went through each individual container, found a prescription bottle with her name on it, and I opened it up, and it contained two pieces of what looked like to me rock cocaine.

Welch also found inside a "little leather money pouch" some 2-inch glass pipes with filters used to smoke cocaine.

After Welch told Smith about finding the cocaine, Smith said, " 'Officer, you know that I'm a user. What you found was mine, but I don't sell drugs. Yeah, I smoke cocaine.' "

By information filed on August 17, 1992, the State charged Smith with one count of possession of cocaine occurring on August 12, 1992.

During the hearing on Smith's motion to suppress the cocaine, Welch stated that he "books" about 15 to 20 people each month. The following testimony was elicited by the prosecutor:

> Q: On each of those occasions, is it your job to be familiar with the policies of the booking procedures of the Seattle Police Department?
> A: Yes.
> Q: Are you familiar with those policies?
> A: Yes.
> Q: Is it part of the standard procedure during booking to inventory the personal property of individuals that are being booked into the jail?
> A: The King County Jail requires [us to] inventory and get any valuable items on a form that they have, a property sheet. They also want any sharp items, any knives, to be separated, put into a separate container and marked, either a knife or a sharp instrument. Also looking for any kind of needles that are contraband.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

Q: In the times that you have booked someone through af-
ter arresting them in those nine and a half years, have
you ever not searched or inventoried the personal prop-
erty of one of those individuals?

A: No.

Q: Was there anything different that you did during the
booking procedure of Ms. Smith that you hadn't done
before, or that wasn't part of the standard procedure?

A: No.

On cross examination, Welch stated that when he went
through the purse, he "was looking for any valuable items.
[He] was looking for a number of things, if there's drugs, any
valuables, if there's knives or needles."

Officer Aakervik testified as follows:

Q: What is the Seattle Police Department booking procedure
regarding searching or inventorying personal property of
people being booked into jail?

A: We take an inventory for any valuables or money, and
also searching their person or purses or personal effects
before it's brought to the jail for any contraband or
weapons, and inventorying valuables also.

Aakervik also testified that items taken from people being
booked into the jail are kept in a property room, and arrest-
ees are not allowed to take such items into the holding cells
or the jail.

Smith testified that she did not leave her car with a friend
and did not ask the police to go into her car. She said she
"didn't ask them to do any of that". Smith admitted on cross
examination that she had prior convictions for forgery and
theft.

In its oral opinion, the trial court ruled that because the
warrant was a "no bail" warrant, "it would have been highly
unlikely that there would have been an opportunity for
someone to come down [to] release Ms. Smith right away".
The court specifically found that, once arrested, Smith asked
the officers to retrieve her purse. As for the search of the
purse, the trial court said:

Once the officers got the purse as incident to the arrest,
they would have had the opportunity to search it, and that
they didn't is not fatal to the claim that they had made. Once
they got to the station, the officers had a right to book and

secure, to book her and naturally go through the purse, to inventory the different items.

The court denied the motion to suppress. Smith waived her right to a jury trial and submitted the case to the court for a determination on the police reports. The court found Smith guilty as charged.

Although the deputy prosecuting attorney told the trial court that written findings of fact and conclusions of law from the suppression hearing would be prepared, no such findings have been prepared or filed.

This appeal timely followed Smith's conviction.

## VALIDITY OF SEARCH[2]

A warrantless search is presumed unreasonable except in a few established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). Searches pursuant to a lawful arrest and routine inventory searches are recognized exceptions to the warrant requirement. *United States v. Chadwick*, 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977); *Colorado v. Bertine*, 479 U.S. 367, 93 L. Ed. 2d 739, 107 S. Ct. 738 (1987). The inventory search is a recognized exception because, unlike a probable cause search and a search incident to arrest, the purpose of an inventory search is not to discover evidence of a crime, but to perform an administrative or caretaking function. The often-cited reasons justifying the inventory search are to protect the arrestee's property from unauthorized interference while he is in jail; to protect the police from groundless claims that property has not been adequately safeguarded during detention; and to avert any danger to police or others that may have been posed by the property. Knowledge of the precise nature of the property protects against claims of theft, vandalism, or negligence. *Colorado v. Bertine, supra* at 373; *State v. Garcia*, 35 Wn. App. 174, 665 P.2d 1381, *review denied*, 100 Wn.2d 1019 (1983).

The central inquiry in an inventory search is whether it is reasonable under all the facts and circumstances of the

---

[2]Smith does not challenge the validity of her arrest.

particular case. *South Dakota v. Opperman*, 428 U.S. 364, 373, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976). Inventory searches are regularly upheld when they are conducted according to standardized police procedures which do not give excessive discretion to the police officers and when they serve a purpose other than discovering evidence of criminal activity. *Colorado v. Bertine, supra* at 375-76.

In *Illinois v. Lafayette*, 462 U.S. 640, 77 L. Ed. 2d 65, 103 S. Ct. 2605 (1983), the defendant was arrested for disturbing the peace. On the way to the police station, he carried a purse-type shoulder bag. At the police station, he was ordered to empty his pockets. After doing so, he took a package of cigarettes from his shoulder bag and placed the bag on the counter. The officer then removed the contents of the bag, and found 10 amphetamine pills inside the plastic wrap of a cigarette package. Lafayette was charged with violating the Illinois Controlled Substances Act. At the hearing on Lafayette's pretrial suppression motion, the officer testified that he examined the bag's contents because it was standard procedure to inventory "everything" in the possession of an arrested person. The trial court held that the search was not a valid inventory of Lafayette's belongings, and the Illinois appellate court affirmed. *Lafayette*, at 642.

On appeal, the United States Supreme Court reversed and held that the search of the bag was a valid inventory search. *Lafayette*, at 648.

After reciting the practical reasons for station-house inventory searches, the Court said:

> Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns. See *United States v. Robinson*, [414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973)] at 235. Finally, inspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity. See 2 W. LaFave, Search and Seizure § 5.3, pp. 306-307 (1978). In short, every consideration of orderly police administration benefiting both police and the public points toward the appro-

priateness of the examination of respondent's shoulder bag prior to his incarceration.

*Lafayette*, at 646-47.

■ In response to the argument that preservation of Lafayette's property and protection of police from claims of lost or stolen property could have been achieved in a less intrusive manner, the Court said that even if true, this circumstance did not make the search unconstitutional. The Court also noted that the real question was not what " 'could have been achieved " 'but whether the Fourth Amendment required such steps; "it is not our function to write a manual on administering routine, neutral procedures of the station house." *Lafayette*, at 647. The Court concluded:

> Applying these principles, we hold that it is not "unreasonable" for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures.

*Lafayette*, at 648.

The officers in this case testified to an established and consistent practice of inventorying the arrestee's personal possessions as part of the booking procedure at the King County jail. A fair interpretation of Officer Welch's testimony is that the common practice was to examine everything and then note on the property sheet anything that could reasonably be described as "valuables". This type of inventory serves the purposes of inventory searches as referred to in the case law and clearly demonstrates that the inventory was not just a pretext to look for incriminating evidence. An inventory of "everything" will disclose drugs and contraband if present. This does not render the search invalid and does not show bad faith or that the sole purpose of the inventory was criminal investigation. *Colorado v. Bertine, supra* at 372.

Smith contends that article 1, section 7 of the Washington Constitution should be applied to the facts of this case and that it generally affords greater protection against warrantless searches and seizures than does the Fourth Amend-

ment. Article 1, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) sets out criteria for determining whether or not article 1, section 7 provides greater protection than does the Fourth Amendment.

Assuming without deciding that article 1, section 7 of the Washington Constitution applies to the search of Smith's purse, the case law of this state supports the validity of the inventory search of Smith's purse.

■ *State v. Gluck*, 83 Wn.2d 424, 428, 518 P.2d 703 (1974) notes that our cases have long recognized inventory searches as a practical necessity, but

> we have also insisted that they be conducted in good faith for the purposes of (1) finding, listing, and securing from loss during detention, property belonging to a detained person, (2) protecting police from liability due to dishonest claims of theft, and (3) protecting temporary storage bailees against false charges.

The limits on inventory searches set out in *Gluck* and *State v. Houser*, 95 Wn.2d 143, 622 P.2d 1218 (1980) were not exceeded in this case. We conclude that the inventory search involved here was valid under the warrant clause of the Fourth Amendment and article 1, section 7 of the Washington Constitution.

### TRIAL COURT'S FAILURE TO ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ Smith contends that the trial court's failure to enter findings of fact and conclusions of law requires reversal and dismissal. A court's failure to enter written findings of fact and conclusions of law following a suppression hearing as required by CrR 3.6 is harmless error if the court's oral opinion and the record of the hearing are "so clear and comprehensive that written findings would be a mere formality". *State v. Smith*, 68 Wn. App. 201, 208, 842 P.2d 494 (1992).

The court in its oral opinion stated as follows:

> The Court will find that Ms. Smith did in fact ask the officers to get her purse. I think that it's not reasonable under the circumstances for her to have left her purse there in the

car. I say this based, among other things, on the direct testimony from the defendant that there was nobody else around who would have been able to take care of the situation. "I left the car parked on the street with no friend around." So to me, the totality would indicate that she did ask the officers to get the purse.

Once the officers got the purse as incident to the arrest, they would have had the opportunity to search it, and that they didn't is not fatal to the claim that they had made. Once they got to the station, the officers had a right to book and secure, to book her and naturally go through the purse, to inventory the different items.

Now, this case is distinguished from State v. Smith in a couple of very critical ways on the heel of this. The no-bail warrant meant that it would have been highly unlikely that there would have been an opportunity for someone to come down [to] release Ms. Smith right away. And by releasing her right away, that means that she and the purse could have been gone. This is to be distinguished from the $25, or other kind of bond amount that was stated or referenced in State v. Smith and its progeny. So the Court at this point has to conclude that the motion to suppress will be denied.

The trial court's oral opinion makes it clear to us what its findings would have been had it formally entered findings. No further findings are necessary in order for us to review the basis of the trial court's ruling. In *State v. Smith, supra*, the court stated why the trial court's opinion was not sufficiently clear and comprehensive to permit review without written findings. In this case, the absence of written findings did not prejudice Smith and does not impede review. However, we again remind the State that there is a strong presumption that dismissal is the appropriate remedy when required findings are absent. *Smith*, at 211.

We affirm the judgment.

BAKER, A.C.J., and BECKER, J., concur.

Review denied at 126 Wn.2d 1003 (1995).