# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57025-4-II |
| Respondent, | |
| v. | |
| BRITTNEY L. SCHUMATE, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Brittney Shumate appeals her conviction for 10 counts of animal cruelty in the first degree. She asserts the warrantless entry of her apartment should result in suppression of all evidence obtained. She also argues that there is insufficient evidence supporting her conviction of animal cruelty under RCW 16.52.205. Further, she argues that the superior court's failure to enter written findings of fact and conclusions of law for its trial decision requires remand. Lastly, Shumate argues the superior court's order requiring her to pay community custody supervision fees is unauthorized and must be stricken from the judgment and sentence.

We conclude that the search was lawful. Because the State concedes that the superior court failed to enter written findings after trial in accordance with CrR 6.1(d), and the record as comprised does not allow appellate review, we accept the State's concession and remand for entry of written findings and conclusions. Accordingly, we do not reach the merits of Shumate's sufficiency argument. Finally, we accept the State's concession and additionally remand for the trial court to strike the imposition of community custody supervision fees and to reconsider the

deoxyribonucleic acid (DNA) collection and victim penalty assessment legal financial obligations (LFOs).

FACTS

I.    BACKGROUND

Brittney Shumate signed a lease with a termination date of February 29, 2020, for an apartment in Longview, where she lived with her boyfriend and children. When signing the lease, Shumate did not identify any animals living in her apartment.

Come fall 2019, apartment general manager Brandi Bate commenced eviction due to nonpayment of rent and lack of communication. Despite Bate reporting having seen Shumate at the apartment in December 2019, she stated she received constant complaints from other tenants regarding barking coming from Shumate's apartment. But there was no answer when she reached out to Shumate to tell her of the complaints in December.

In January 2020, Bate filed a complaint for restitution of property and damages in superior court. In the complaint, Bate noted Shumate received both a 14-day notice to pay or vacate in November 2019 and a 20-day notice to terminate tenancy and vacate in December 2019 via posting at the residence and through first-class mail.[1]

Bate attempted to reach Shumate but was unsuccessful. On January 24, 2020, still unable to reach Shumate, Bate called the Cowlitz County Humane Society Animal Control, unlocked the door, and let them enter Shumate's apartment. A total of 10 deceased animals were removed from the apartment. In the process of removing the deceased animals, animal control took photos of the animals and conditions within the apartment.

---

[1] Because Bate was unable to have Shumate served with the complaint, and Shumate was apparently not present at the apartment, a show cause hearing on the unlawful detainer action was not held. The matter was later dismissed in June 2020.

II.    PROCEDURAL HISTORY

On December 8, 2021, the State charged Shumate with 10 counts of animal cruelty in the first degree. Before the scheduled April 27, 2022 trial, Shumate filed a motion to suppress all the evidence discovered by the humane society. The superior court denied her motion finding she had abandoned her apartment and, therefore, no longer had a reasonable expectation of privacy and no ability to prevent Bate from consenting to the search.

The trial court entered written findings and conclusions supporting its decision denying the motion to suppress. First, the court found Bate had attempted to contact Shumate since January of 2020 in order to serve her with eviction documents and inform her of animal noise complaints but was unsuccessful. It further found that after animal noises suddenly stopped, Bate again tried to contact Shumate and knocked on the apartment door without avail. Afterwards, Bate contacted the Cowlitz Public Utilities District who informed her that services had been terminated since December 2019. Consequently, Bate along with one of her employees, opened the door to the apartment and saw unsanitary conditions, including animal feces, urine, and a deceased cat in the doorway. Next, Bates called animal control and allowed them entry into the apartment where they found trash and a number of decaying and deceased animals. Animal control removed the animals and Bate had her employees clean and repair the apartment. The superior court concluded that Shumate's lack of response to Bate's multiple attempts at contact and the inability of a process server to contact her showed Shumate had abandoned the apartment prior to January 11, 2022. It concluded that Bate's entry on January 24 was lawful. Shumate waived her right to a jury trial and the parties proceeded to a bench trial.

III.    TRIAL

Shumate's bench trial for all 10 counts of animal cruelty in the first degree was held on April 27, 2022.  The court heard testimony from Bate, officers Nathan Stanyer and Tina Melton of the humane society animal control, and Shumate.

A.    Bate's Testimony

At trial, Bate recounted the events of January 24, 2020.  Bate noted that on the day of the search, the animal noises coming from Shumate's apartment had suddenly stopped, so she tried to contact Shumate.  However, she had no luck.  Bate then called the public utilities department to check if there was electricity and heat but was told services had been shut off in December 2019.  After learning the power was off, coupled with a terrible smell emitting from the apartment, Bate decided to conduct a welfare check.  But before entering the apartment, she called the Longview Police, noting there might be animals inside, and they advised her to call the humane society animal control.  She did.

While waiting for the humane society to arrive, Bate and one of her employees opened the apartment door.  Bate could not enter the apartment because of how bad it smelled.  But upon opening the door, they saw a deceased cat lying in the entryway and "[a] whole lot of feces," "toys," "clothes," and other "stuff piled everywhere."  Rep. of Proc. (RP) at 57.  Once animal control arrived, she permitted them to enter the apartment while she went to her office to wait.

After animal control departed with nine deceased animals, Bate sent some of her employees into the apartment to clean.  They found a tenth deceased animal.

4

B.      Animal Control Officers

1.      Nathan Stanyer

Next, the court heard testimony from humane society animal control officer Nathan Stanyer. Stanyer stated that upon first arriving, he observed Bate standing outside the apartment with the door open. Stanyer added that "[f]rom the outside, [he] could see . . . unsanitary condition[s]: feces, urine . . .garbage." RP at 64. And once Bate permitted him to enter the apartment, all the clutter "made it difficult to even walk through the apartment. . . [and] [that] the smell was so overwhelming [he] had to put [on] a . . .face mask respirator . . . to even proceed far into the apartment." RP at 64-65.

Ultimately, Stanyer found a total of nine deceased animals in the apartment. He also stated that he took photographs of where he found each.[2] He testified that all the animals found were in poor condition, emaciated, and covered in fleas, with two being just "bones and a little bit of fur." RP at 73. The animals were then taken to the human society animal clinic for examination by a veterinarian.

Three days later, Stanyer located Shumate at a hotel in Kelso. Shumate provided the animals' names and that she was the owner, but did not show remorse. Shumate also said she went to a party in December and left the animals in her boyfriend's care, but had yet to return to the apartment since then. Lastly, Stanyer noted Shumate did not discuss a plan for subsequent care of the animals after she left them in December.

---

[2] One animal was found "barely alive" by Shumate's sister after Bate called her in an attempt to reach Shumate. RP at 7. The dog was taken by the sister after she and Bate dug "feces and stuff out of the [animal's] nose so that it could breathe." RP at 58. Bate informed the humane society of the dog after it was taken.

2.      Tina Melton's Testimony

The court also heard from Officer Melton. She noted that she was working dispatch on the day of the incident and had dispatched Stanyer to the apartment following Bate's call. She added that she became involved once the animals were removed and brought to the humane society for documentation and examination.

Melton assisted Stanyer in taking photographs of the animals, noting some were just skeleton and fur and others were intact but appeared severely emaciated. She testified that when positioning the animals for photos, flesh and fur was "sloughing off." RP at 86. She also testified that all the animals were infested with fleas that were still alive and feeding on the deceased animals.

Melton also accompanied Stanyer when interviewing Shumate at the hotel. She noted Shumate said she had asked her boyfriend for help with the animals for the first few days she was gone but did not have a set plan after that, nor did she ever reach out for help from the humane society, shelters, or animal control. Lastly, Melton noted Shumate did not express concern about the animals when questioned.

C.      Shumate's Testimony

Next, the court heard from Shumate. She stated that she went away for a week or two around Thanksgiving in 2019, leaving the animals in the care of her boyfriend, Kenzie Lian. After returning, she stated the animals appeared cared for. In December, she visited her parents and left her boyfriend in charge of the animals again. She testified that she provided him with money to buy the animals food while she was gone.

Shumate added that Lian said he would take care of the animals after she went to the Kelso motel upon learning she was being evicted. She said that originally, in early January, she had brought one of the dogs with her to the motel but was later told she could not have any animals there, so she returned them to the apartment. She continued, testifying that when she entered the apartment in January to return the dog, there was power and heat, and all had food and water.

Shumate stated she learned of the animal's deaths when Stanyer questioned her at the end of January. And upon hearing the news, she was very upset to learn they were deceased.

IV.    COURT'S ORAL RULING

The court issued an oral ruling. In its ruling, the court stated that it was looking to see if Shumate's actions were a "gross deviation" from the reasonable person standard. It highlighted that Shumate did not inquire about the well-being of the animals, along with the photographs taken by Stanyer showing "disorganization within the apartment; clutter . . . ; [and] filth," stating that a person could not have taken many steps in the apartment "without having to step on or over something." RP at 130. The court further stated that one could infer from the testimony and evidence that the last time Shumate did go to the apartment, it "probably looked relatively similar to the pictures . . . arguably minus the animals in the positions that that the animal were in." RP at 130.

Next, the court called attention to Shumate's testimony that she was there in January and indicated that everything was good and the animals were cared for by Lian, whereas a few weeks later, the animals were deceased. The court then stated, "I don't know how one can overlook the

7

status of the apartment with the number of animals that were in that apartment, and think that was an acceptable way to leave those animals." RP at 132. Ultimately, the court found Shumate criminally negligent and guilty of all 10 counts. The court did not enter written findings and conclusions.

V. JUDGMENT AND SENTENCING

Shumate appeared for sentencing on May 9, 2022. Shumate's attorney argued she was indigent and requested the court strike all non-mandatory fees. The court appeared to agree, saying it would impose only the standard fees, which were the victim crime fee and the DNA collection fee.[3] A judgment and sentence order was entered. The order assessed supervision fees.

Shumate appeals.

ANALYSIS

I. THE ENTRY INTO THE APARTMENT BY ANIMAL CONTROL WAS LAWFUL BECAUSE BATE, DUE TO SHUMATE'S ABANDONMENT, HAD PERMISSION TO ALLOW ENTRY

Article I, section 7 of the Washington State Constitution provides that: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." When considering an alleged violation of a privacy interest, Washington courts ask whether the State has unreasonably intruded into a person's private affairs. *State v. Sweeney*, 125 Wn. App. 881, 885, 107 P.3d 110 (2005).

> [I]nterpretation and application of article I, section 7 requires a two-part analysis. The first step requires us to determine whether the action complained of constitutes a disturbance of one's private affairs. If there is no private affair being disturbed, the analysis ends and there is no article I, section 7 violation. If, however, a private affair has been disturbed, the second step is to determine whether authority of law justifies the intrusion. Authority of law may be satisfied by a valid warrant.

*State v. Puapuaga*, 164 Wn.2d 515, 522, 192 P.3d 360 (2008).

---

[3] Shumate requests, and the State concedes, that the supervision fee should be stricken.

Private affairs are not determined according to a person's subjective expectation of privacy but, in part, are determined by examining the historical treatment of the interest asserted. *Id*. But if history does not show whether the interest is one entitled to protection under article I, section 7, the court asks whether the expectation is one that a citizen of this state is entitled to hold. *Id*.; *State v. Hartman*, ___ Wn. App.____, 534 P.3d 423, 432 (2023).

A warrantless search violates article I, section 7 unless it falls under one of "'a few jealously guarded exceptions.'" *State v. MacDicken*, 179 Wn.2d 936, 940, 319 P.3d 31 (2014) (quoting *State v. Afana*, 169 Wn.2d 169, 176-77, 233 P.3d 879 (2010)). Voluntarily abandoned property is such an exception to the warrant requirement. *State v. Samalia*, 186 Wn. App. 224, 228, 344 P.3d 722 (2015); *State v. Kealey*, 80 Wn. App. 162, 907 P.2d 319 (1995) (police may search misplaced purse to determine its owner even though they know it contains contraband; expectation of privacy is diminished). Because Shumate does not challenge specific findings of fact, we review only the trial court's order under article 1, section 7 de novo.[4] *State v. Dugas*, 109 Wn. App. 592, 595, 36 P.3d 577 (2001).

Abandonment is primarily a question of intent which may be inferred from words, acts, and other objective standards. *State v. Evans*, 159 Wn.2d 402, 408, 150 P.3d 105 (2007). Therefore, the question is whether Shumate so relinquished her interest in the property that she no longer had a reasonable expectation of privacy.

---

[4] To be clear, the only factual issue Shumate assigns error to and briefs relates to the trial court's use of the wrong year in its findings; that error appears to be a scrivener's error. The court generally does not consider an issue that has not been briefed or argued in a meaningful way. *Ameriquest Mortg. Co. v. State Att'y Gen.*, 148 Wn. App. 145, 166, 199 P.3d 468 (2009), *aff'd on other grounds by Ameriquest Mortg. Co. v. Wash. State Office of Att'y. Gen.,* 170 Wn.2d 418, 241 P.3d 1245 (2010). Accordingly, we do not address this further.

Shumate primarily relies on *State v. Birdsong*, 66 Wn. App. 534, 832 P.2d 533 (1992), for the proposition that she did not abandon the property, so she maintained the sole undisputed possession of the leased premises and therefore animal control's entry into the apartment was unlawful. Specifically, Shumate argues there was no evidence showing she planned to terminate the lease, as she still had the keys and did not notify anyone that she planned to move out.

Contrary to Shumate's assertions, *Birdsong* is distinguishable. Birdsong moved out of his rental home weeks before the end of the lease but left furniture in the garage. *Id*. at 534. More significantly, after the police were called by the landlord, but before the police had entered, Birdsong arrived to clean the home and remove his possessions. *Id.* The court held that the evidence was insufficient to show Birdsong had abandoned the property and the search and seizure without his consent was unreasonable violation of his private affairs. *Id.* at 538. It explained that Birdsong himself retained the key, kept his possessions there, and was present at the time of search because he was going to clean the house and remove his possessions. *Id*. at 539.

Turning to the case before us, assuming Shumate retained her key and kept her property at the apartment, the similarities to *Birdsong* end there. Unlike *Birdsong*, here, the facts show that Shumate abandoned her apartment before animal control entered the premises. Despite Bate seeing Shumate in December 2019, Bate received constant complaints from tenants regarding animal noises in the apartment, and Bate reached out to Shumate but never received a response. Bate also provided Shumate notice to pay or vacate twice via posting and first-class mail, but again Shumate never responded or paid as she never received the notice. Then, after animal noises stopped suddenly, Bate tried to reach Shumate but was unable to. Finally, when performing a welfare check, observed obvious evidence of abandonment in the form of deceased animals, trash, feces, and scattered debris. This evidence is a far cry from Birdsong's active involvement in the

10

subject home. The trial court did not err in concluding Shumate abandoned the apartment. Shumate did not maintain a reasonable expectation of privacy in the apartment. Accordingly, entry was lawful and her argument fails.

II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

Next, Shumate argues, and the State concedes, that the superior court failed to enter written findings of fact and conclusions of law after trial pursuant to CrR 6.1(d). We accept the State's concession. We also conclude that, though we may in our discretion review issues even absent findings and conclusions, the record on appeal here is insufficient to allow review. We may decline to address an issue because the appellate record is inadequate. *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

CrR 6.1(d) provides that "[i]n a case tried without a jury, the court shall enter findings of fact and conclusions of law." The purpose of the rule is to facilitate appellate review. *State v. Head*, 136 Wn.2d 619, 622, 964 P.2d 1187 (1998). Therefore, courts have frequently "refused to address issues raised on appeal in the absence of such findings and conclusions." *Id*. at 624. Oral rulings by the trial court do not cure the absence of formal written findings of fact and conclusions of law. *Id.* at 622. Nevertheless, failure to enter written findings and conclusions is harmless where the trial court's oral findings sufficiently explain how the facts met the elements of the charge as they are "'so clear and comprehensive that written findings would be a mere formality.'" *State v. Smith*, 76 Wn. App. 9, 16, 882 P.2d 190 (1994) (quoting *State v. Smith*, 68 Wn. App. 201,

11

208, 842 P.2d 494 (1992)); *Head*, 136 Wn.2d at 621-23. Here, the superior court's oral ruling is as follows: "I don't know how one can overlook the status of the apartment with the number of animals that were in that apartment, and think that was an acceptable way to leave those animals." RP at 132.

The oral ruling is insufficient to permit review of Shumate's assignment of error regarding sufficiency of the evidence. Accordingly, we remand for entry of written findings and conclusions.

III.     FEES

Next, Shumate argues, and the State concedes, that the superior court's order requiring her to pay community custody supervision fees is unauthorized under RCW 9.94A.703 and must be stricken from the judgment and sentence. We accept the State's concession.

RCW 9.94A.703 governs community custody conditions and outlines which fees the trial court must impose and which it may waive. Former RCW 9.94A.703(2)(d) (2018) provided that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . [p]ay supervision fees as determined by the department." However, the statute was recently amended. The amendment removed the waivable community custody supervision fee condition. *See* RCW 9.94A.703; SECOND SUBSTITUTE H.B. 1818, 67th Leg., Reg. Sess. (Wash. 2022). Although the amendment was not effective until July 1, 2022, after Shumate filed her appeal, Division Three of this court recently held that the amendment to RCW 9.94A.703 applies to cases pending on appeal. *State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). We agree with the reasoning in *Wemhoff* and adopt it here.

Although Shumate argues that only the community custody fees should be stricken under RAP 2.5(a), we exercise our discretion to address the DNA collection fee and victim penalty assessment fee. Recent legislative changes eliminated the DNA collection fee unless the defendant's DNA was previously collected as a result of a prior conviction. LAWS OF 2023, ch. 449, § 4.

Similarly, RCW 7.68.035(1)(a), which imposes a victim penalty assessment fee "for each case or cause of action that includes one or more convictions of a felony or gross misdemeanor," was also amended, allowing waiver of the fee if the superior court finds that "the defendant, at the time of sentencing" was indigent. LAWS OF 2023, ch. 449, §1. Accordingly, the court should reconsider the DNA collection fee and victim penalty assessment upon remand. RCW 43.43.7541(2); RCW 7.68.035(4)-(5)(b).

Accordingly, we remand with instructions to strike the supervision fees, and for the superior court to reconsider the DNA collection fee and victim penalty assessment fee in light of the recent statutory changes.

## CONCLUSION

We conclude that the search of the apartment was lawful. We do not reach the merits of Shumate's challenge to the sufficiency of the evidence underlying her conviction, but instead remand for the trial court to enter written findings and conclusions regarding the bench trial. Finally, we remand to the trial court to (1) strike the requirement that Shumate pay community custody supervision fees and (2) for the court to reconsider the DNA collection and victim penalty assessment LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Glasgow, C.J.

Price, J.